(Rev. 5/05)

## FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
### UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

(1) _James Arthur Higgins  #319214_
    (Name of Plaintiff)    (Inmate Number)

_Delaware Correctional Center_
_Smyrna, Delaware 1997_
    (Complete Address with zip code)

(2)_____
    (Name of Plaintiff)    (Inmate Number)

_____
    (Complete Address with zip code)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

vs.

(1)_Gov. Ruth Ann Minner, and the State Of Delaware, et al,_

(2)_Carl C. Danberg, and the Delaware Department of Corrections, et al,_

(3)_Correctional Medical Services, Inc. et al_
    (Names of Defendants)

(Each named party must be listed, and all names
must be printed or typed. Use additional sheets if needed)

**08 - 004**
    (Case Number)
( to be assigned by U.S. District Court)

# CIVIL COMPLAINT

• • Jury Trial Requested

FILED

JAN 03 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

PD scanned
IFP

## I.  PREVIOUS LAWSUITS

A.    If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

N/A

Additional Known Defendants

1. John Carney, Lieutenant governor for the State of Delaware;
2. Jack Markell, is treasurer for the State of Delaware;
3. Rick Kearney, is the Bureau Chief for the Delaware Bureau of Prisons (BOP);
4. Kathy English, is the Deputy Bureau Chief for the Delaware Bureau of Prisons (BOP);
5. James Welsh, is the Medical Director/Administrator for the Delaware Department of Corrections (DOC);
6. Thomas L. Carroll, is former warden of the Delaware Corrections Center (DCC) and current dept administrator at the Delaware Dept of Corrections administrative office, Dover, Delaware;
7. Cindy Dibble, serves as deputy assistant to James Welsh at the Delaware Dept of Corrections (DOC);
8. Elizabeth Burris, serves currently as interum warden at the Delaware Correction Center (DCC), and is officially (DCC) deputy warden II;
9. David Pierce, serves as deputy warden I, at the Delaware Corrections Center (DCC);
10. James Scarborough, is chief of security for the Delaware Corrections Center (DCC);
11. David Holman, serves as chief of security for the Delaware Corrections Center (DCC);
12. Ronald Holsterman, serves as treatment administrator for the Delaware Corrections Center (DCC);
13. Tonyo Lewis, serves as Delaware Corrections Center (DCC) transfer officer;
14. Michael Mc.Creanor, serves as a captian and chairman of institutional grievances at the Delaware Corrections Center (DCC);
15. Michael Cruthers, is a captian and shift commander at the Delaware Corrections Center (DCC);
16. Karl Hazzard, is a captian and shift commander at the Delaware Corrections Center (DCC);
17. Alisa Profaci, serves as a staff Lieutenant at the Delaware Corrections Center (DCC) and MHU administrator;
18. Paul Harvey, Jr., serves as a lieutenant at the Delaware Corrections Center (DCC);
19. John Salas, serves as a lieutenant at the Delaware Corrections Center (DCC);
20. Michael Welcome, serves as a lieutenant at the Delaware Corrections Center (DCC);
21. _____ Fields, serves as a lieutenant at the Delaware Corrections Center (DCC);
22. _____ Watkins, serves as a lieutenant formerly of the Delaware Corrections Center (DCC);

23. Lisa M. Merson, serves as a corporal and institutional grievance chair person at the Delaware Correctional Center (DCC);

24. Dr. Kenneth Ivens, served as a physcian and reginal medical director for Corrections Medical Services, Inc., (CMS);

25. Dr. Sittie-Gombeh Ali, served as a physcian and reginal medical director for Correctional Medical Services, Inc., (CMS);

26. Dr. _____ Durst, served as a physcian and reginal medical director for Correctional Medical Services, Inc., (CMS);

27. Dr. _____ Brown, serves as a physcian and reginal medical director for Correctional Medical Services, Inc., (CMS);

28. Dr. Freddrick Vandusen, serves as a physcian for Correctional Medical Services, Inc., (CMS);

29. Maggie Bailey, serves as a nurse-practitioner for Correctional Medical Services, Inc., (CMS);

30. Dr. _____ Mancuso, is a physcian for Correctional Medical Services, Inc., (CMS);

31. Dr. Louise Desosees, is a physcian for Correctional Medical Services, Inc., (CMS);

32. Thoma Chucks, serves as a physcian/nurse practitioner for Correctional Medical Services, Inc., (CMS);

33. Dr. _____ Teevedi, serves as a physcian for Correctional Medical Services, Inc., (CMS);

34. Dr. _____ Tegegonie, serves as a physcian for Correctional Medical Services, Inc., (CMS);

35. Scott Altman, serves as quality control assurance monitor for Correctional Medical Services, Inc., (CMS);

36. Christine Maloney, serves as reginal medical administertor for Correctional Medical Services, Inc., (CMS);

37. John Rundle, serves as reginal medical administertor for Correctional Medical Services, Inc., (CMS);

38. Ann McLaren, serves as reginal nursing director and medical grievance chairman for Correctional Medical Services, Inc., (CMS);

39. Terry Hastings, serves as a medical administertor for Correctional Medical Services, Inc., (CMS);

40. Gina Wolken, serves as a medical administertor for Correctional Medical Services, Inc., (CMS);

41. Gail Elkins, serves as a nurse and medical grievance administrator for Correctional Medical Services, Inc, (CMS);

42. Debbie Rodweller, is a nurse and medical grievance administrator for Correctional Medical Services, Inc, (CMS);

43. Lee Ann Dunn, serves as a nurse and seating medical grievance committee member for Correctional Services, Inc. (CMS);

44. Andeine Beanch, serves as a nurse and seating medical grievance committee member for Correctional Services, Inc, (CMS);

45. Jannifer _____, is a nurse at the Delaware Correctional Center, for Correctional Medical Services, Inc, (CMS);

46. Dr. _____ Cooper, serves as a phycian and reginal medical director, for Correctional Medical Services, Inc, (CMS);

47. Amy Munson, serves as reginal medical director for Correctional Medical Services, Inc, (CMS);

48. Judith Mellen, served as Delaware chapter president of the American Civil Liberties Union and current director for the Center for Justice, (DCJ);

49. Nikita Robins, serves as the Delaware Center for Justice (DCJ) adult offenders manager;

50. Janet Laban, serves as the director for the Delaware chapter of the American Civil Liberties Union (A.C.L.U.).

49. Donna Plante, serves as administration officer for Correctional Medical Services, Inc, (CMS);

50. Audrey Gibson-Valdez, serves as a nurse and medical grievance committee member for Correctional Medical Services, Inc, (CMS);

51. Brenda Heddinger, service as a nurse and medical grievance committee member for Correctional Medical Services, Inc, (CMS);

52. Gordon Oshenks, serves as medical administrator for Correctional Medical Services, Inc, (CMS);

53. Dr. _____ Aligorie serves as a doctor for Correctional Medical Services, Inc, (CMS);

54. Dr. _____ Teevedi serves as a doctor for Correctional Medical Services, Inc, (CMS);

55. Ron Moore, serves as a Administrator for Correctional Medical Services, Inc, (CMS);

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

A.    Is there a prisoner grievance procedure available at your present institution?    • (Yes) • •No

B.    Have you fully exhausted your available administrative remedies regarding each of your present claims?    • (Yes) • •No

C.    If your answer to "B" is Yes:

    1.    What steps did you take? Submitted grievances and exhausted each grievance procedural level, including writting letter to state, legal aid & prison officials.

    2.    What was the result? Administrative grievance system fully exhausted, in which i won on appeal, but has continued to be denied medical needs.

D.    If your answer to "B" is No, explain why not: _____

_____

## III.    DEFENDANTS (in order listed on the caption)

(1) Name of first defendant: _____ Ruth Ann Minner _____

Employed as ___ governor ___ at ___ Tatnall Building ___

Mailing address with zip code: _____ Dover, Delaware 1991 _____

(2) Name of second defendant: _____ Carl C. Danberg _____

Employed as ___ Commissioner ___ at ___ Delaware Dept of Corrections ___

Mailing address with zip code: _____ 245 Mc Kee Road _____

_____ Dover, Delaware 19904 _____

(3) Name of third defendant: _____ Correctional Medical Services, Inc., et al _____

Employed as ___ Medical Professionals ___ at ___ Delaware Correctional Center ___

Mailing address with zip code: _____ 1301 College Park Drive _____

_____ Suite 101, Dover, Delaware 19904 _____

(List any additional defendants, their employment, and addresses with zip codes, on extra sheets if necessary)

## IV. STATEMENT OF CLAIM

(State as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach no more than three extra sheets of paper if necessary.)

1.  See Attached Memorandum

2.

3.

## V.    RELIEF

(State briefly exactly what you want the Court to do for you. Make no legal arguments. Cite no cases or statutes.)

1.  Requests declaratory, monotary awards under compensatory and punitive relief. In addition, to requesting injunctive relief.

3

2.

3.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___29___ day of ___December___, 2 007.

___James Arthur Diggins___
(Signature of Plaintiff 1)

_____
(Signature of Plaintiff 2)

_____
(Signature of Plaintiff 3)

4

In The United States District Court
For The District Of Delaware

James Arthur Biggins,
                    Plaintiff,

            vs

Gov: Ruth Ann Minner, and the State of Delaware,
et al.,
Carl C. Danberg, and the Delaware Dept of Corr,
et al.,
John Rundle, and Correctional Medical Serv's, Inc,
et al.,
Judith Mellen, and the Delaware Center For Justice, et al.,
Janet Laban, and the Delaware Chapter of the
American Civil Liberties Union, et al.,
Defendant's each sued in their individual and official
capacities.

|  |
|---|
| Civil Action No. _____ |
| Jury Trial Demanded |

### Plaintiff's Memorandum Of Law

Comes Now, the plaintiff, James Arthur Biggins, pro se, hereby submit the following in support of this instant action:

1. This is a civil action for damages and injunctive relief pursuant to 42 U.S.C §§§§§ 1981, 1983, 1985, 1986 and 1988 alleging continual violations of the denial of plaintiff's civil rights guaranteed by the United States Constitution and its Amendments, the right to be free of cruel and unusual punishment and equal protection of the laws; and the Delaware Constitutional laws Article I, Section II, alleging violations of plaintiff's rights to be free from cruel punishments, and that proper regard shall be had to the health of prisoners; and statutory laws of Delaware under Del. Const. of 1897, art I, §11. Wheeler v. Sullivan,

599 F. Supp. 630, 631 (1984); Title II Del. C. §1202 as applicable to §6536 - Delaware Dept. of Corr., standard for providing reasonable health, mental and dental services for state prisoners, as alleging "misuse of public office and improper influence" see 28 Del. C. §1201; Title 18 Del. C. §§§ 6536, 6801 and 6803; the Delaware Dept. of Corr, Inmate Reference Manual (IRM) 2.2 §II at pages 1 and 3, citing Berry v. CMS, 1994 Del. Super. Lexis 219 *8 (Del. Super. Ct. 1994) (citing Vicks v. Dept. of Corr., 1993 Del. Super. Lexis 115 (Del. Super. Ct. 1993); Prosser and Keeton on Torts, §§ at 36, 5th ed 1984; 42 U.S.C. §1997e(e) as is applicable to Title 10 Del. C. §4001(3) alleging "intentional emotional infliction of wanton and unnecessary pain and suffering, emotional infliction of distress caused by extreme and outrageous conduct. Brett v. Berkowitz, 716 A.2d 509, 513 (Del. 1998); James v. Goldstein, 2003 WL 23274843 (Del. Super. 2003)

2. The Court has its original jurisdiction over plaintiff claims under 28 U.S.C. §§§ 1331, 1332, 1343 and 1367; 29 U.S.C. §651 et seq., including §653(b)(4); Title II of the Americans with Disabilities Act (ADA) of 1990, §§ 201-243; 42 U.S.C. §§ 10131-12165, the Civil Rights Acts of 1964, 1968 and 1991; 29 U.S.C. §2000 et seq.; Prison Litigation Reform Act (PLRA) of 1995, §101(a); the Civil Rights of Institutionalized Persons Act, §7(a); U.S.C.A. Const. Amend. 8 alleging any and all other State and Federal tort claims for nonfeasance, misfeasance, malfeasance, fraud, breach of fiduciary duties, interference of contract, breach of contract, State and Federal Racketeering Influenced and Corrupt Organization Acts (RICO) violations; conscious continual acts of deliberate indifferences to plaintiff serious medical needs; conscious continual acts of discriminatory medical treatment; conscious deliberate intentional delays and denials of medical treatment as prescribed by a doctor; conscious deliberate intentional delays and denials of medical treatment for non-medical reasons; conscious intentional deliberate interference with medical judgments by non-medical factors; conscious continual failure to carryout medical orders/egregous medical judgment practices; conscious intentional deliberate policy making that is known to cause the denial of adequate access to quality medical care; torts of Battery; Negligence; Deliberate Indifference; Medical Malpractice and Conspiracy.

3. The plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4. The plaintiff claims for injunctive relief and is authorized pursuant to 28 U.S.C.

2.

2283 and 2284, see also Rule 62 of the Federal Rules of Civil Procedures.

5. The District Court of Delaware is the appropriate venue for this civil action pursuant to 28 U.S.C. §1391(b)(2), because it is where the events accurred and comes under Forma Pauperis (IFP) status according with 28 U.S.C. §1915(q) as have filed three or more complaints which has been dismissed, for failure to state a claim upon which relief may be granted, frivolous or malicous.

6. In support of plaintiff's claims, condition and circumstances. The plaintiff cites the recent United States Supreme Court's ruling in Erickson v. Pardus, 122 S.Ct. 2197, 167 L.Ed.2d 108 (2007) ("imminent danger is stated under "failure to provide medical treatment"); Surface Mining Control and Reclamation Act, 30 U.S.C. §1291(8)(1976 ed. Supp. III) ("imminent danger" as the existence of condition ... which could reasonably be expected to cause substantial harm ..... before such condition ... can be abated"); and Mare v. Hargett, 1998 WL 378369 at n.3 (Apr. 22, 1998 N.D.Miss) (finding "sufficiently imminent danger of future physical harm" during prisoner's tenure, in light of con- tinuing conditions).

## Case Facts

7. The plaintiff has been under the care, control and custody of the Delaware Dept of Corrections (DOC), at the Delaware Correctional Center (DCC) in Smyrna, De 19977, since November 21, 1992. Since which time he has undergone num- erous medical treatment plans by three different medical contracted care providers Person Health Care (PHC), First Correctional Medical (FCM), and Correction Medical Services (CMS) for known medical conditions:

(A) Acid Reflux Disease,
(b) Bleeding Ulcers,
(c) Migraine Headaches
(d) Spinal Sclorosis, and
(E) temporary treatment from 1992 to 1999, for Sickle Cell Trait.

8. From these known medical conditions to which has all been categorized at one time or another as "Chronic Care". The plaintiff has repeatedly filed medical

grievances regarding DOC, DCC and their medical providers continual deprivations of ade-
quate medical facilities or equipement as required under the 8th Amendment pursuant
to "cruel and unusual punishment" and "deliberate indifference" to plaintiff's serious med-
ical needs as follows:

1. Inadequately trained medical staffing, including physicians trained in
other area's of medicene than as general practitioners;

2. Lack of X-ray facility or machine;

3. Inadequate record keeping, including lab reports and updated chronic and
non-chronic disease medication depensing in a timely or prompt manner;

4. Lack of adequate medication stocking and other supplies;

5. Lack of adequate communications between DCC and its medical provider's
personnel in establishing transportation for outside medical or physical therapy treatment;

6. Lack of proper sick-call procedures; and

7. Non-medical person's outside interference or interruptions with medical
treat, etc . . . . . . . . . .

8. The plaintiff contends that the state, prison, and medical defendants
continued practices establishes "unnecessary conditions of unnecessary and wanton
infliction of intentional pain and suffering". Notwithstanding, continual "emotional and
physical distress." Estelle v. Gamble, 429 U.S. at 104 (1976). Likewise, when a Court is given
the task of analysing 8th Amendment claims, it must review those claims for (A) whether
a reasonable doctor would perceive the medical need as important and worthy of treat-
ment; (b) whether the medical condition in question significantly affects daily activities,
and (c) whether there is an existence of chronic and substantial pain. Brock v. Wright,
315 F.3d 158, 162 (2d Cir. 2003). In addition, to establish an 8th Amendment claim, a
plaintiff need not prove medical condition life threatening. Gresson v. Doley, 414 F.3d
633 (7th Cir. 2005)(severe heartburn) - compare to plaintiff's medical conditions of

---

1. May the Court be reminded that despite DOC, DCC, and CMS being under a Consent
Decree with the U.S Dept of Justice since Dec 31,2006, regarding providing it's prisoners
adequate health care. They continue not to provide adequate medical treatment.

acid reflux disease and bleeding stomach ulcers; in addition to the plaintiff's other serious medical conditions of Migraine Headaches and Sickle Cell. The plaintiff states that for each he has received little or no effective medical treatment. It wasn't until January 2002, that the plaintiff first received any form of a medicine "Cafergot" that actually had any affect on his migraines. As for his Sickle Cell, he's had to relie solely on his knowledge of the disease when the symptom would affect him. His disease causes his body not to produce red-blood cell, and as the affect the plaintiff can suffer with bouts of vomiting, lost of appetite, dizziness, lost of all or partial physical strength and fevers that can ran over a 100° degrees. The plaintiff fight these symptoms as much as possible, by eating what little foods that served to him to help build his iron count, and minimize the other symptoms by not overexert himself. And received upon initial incarceration Multiple Vitamin for the first year. For the next eight was iether told the disease wasn't detected in my blood test or there wasn't any valid treatment for it.

2. Noted for the Court is that with these medical conditions, the plaintiff treatment is complicated and problematic because of the state, prison and medical officials decisions in medical treatment and prison diet consisting of breakfast, launch and dinner meals that are iether inconsistent with medication active agents or digestive system. Examples, breakfast meals served at least three times weekly pancakes and french toast that is made in some type of butter that causes heartburn, irregular bowl movement and bowl gas. These conditions persist until the substances are passed through the stomach. Launch and dinner meals consist of spice's, salt and sodium products, like sausages, peanut butter, spaghetti and sauce, and soups. All of which causes heartburn, and in concluding claims of unsafe and improper dietary practices, theres their cream or chipped-beef served in all three menue products (breakfast, launch and dinner), that causes any of one or two of the above conditions. These foods account for 85% percent of the meals. Unsafe Food: <u>Ramos v. Lamm</u>, 639 F.2d at. 570-71; <u>Knop v. Johnson</u>, 667 F.Supp. at 522; and <u>Massey v. Hutto</u>, 545 F.2d 95 (8th Cir. 1976). Inadequate Nutrition: <u>Ramos v. Lamm</u>, 639 F.2d 559, 570 (10th Cir. 1980); <u>Balla v. Idaho State Bd of Corrections</u>, 595 F.Supp. 1558 (D.Idaho 1984); and <u>Smith v. Sullivan</u>, 553 F.2d 373, 379 (5th Cir. 1977).

See, Bouchard v. Magnusson, 112 F.Supp. 1196, 1198 (D. Me. 1991) (persistent back pain) compare to plaintiff's need for adequate pain management medication for Spinal Sclerosis, fractured Non-mending Lower-left Vertibes, and Bulge on Spinal Cord. Symptom: numbness in knees and feet, dizziness or black spots, and periodic lost of physical movement. Because of these conditions, plaintiff was prescribed and medically approved by the Bureau Chief twice for a particular medication "Soma" and medical amentities. Inducing further emotional and physical distress, gross wanton unnecessary pain and suffering are the facts that plaintiff routinely doesn't get his nurse depensed medication for these conditions or they are depensed at odd hours inappropriate to the physician's orders and properductive to alleviate pain active agents in medicene (as being time release for affectiveness). Aided by state, prison and medical officials failure to keep plaintiff's other medications, known as "keep on person" in stock. See, Washington, 810 F.2d 1018, 1031 (11th Cir. 1988)(denial of treatment that could eliminate pain and suffering temporary); Boretti, 930 F.2d 1150, 1154-55 (4th Cir. 1991)(needless pain actionable even if there is no permament injury); Kaminasky, 737 F.Supp. 1307, 1319 (S.D.N.Y. 1990)(unnecessary pain and suffering); Young, 307 F.Supp. at 1113 (substantial difficulty walking without pain and discomfort); and Ellis, 890 F.2d 1063 (8th Cir. 1989)(nurse failure to deliver pain medication).

---

3. Noteworthy is that the extent of the plaintiff's back injuries wasn't diagnosed despite numerous past X-rays, until October of 2003. 4. A bottom bunk for safety (keeping him from trying to climb off of the top bunk) and to reduce the pressure on his spin when forced to climb up or down from the top bunk. A pair of sneakers or boots (every six months) to aid in such support and pressure relief on the spin, and a back bance (fitted for the plaintiff). See attached exhibits (A) thru (C), along with copy exhibit of medical gue-vance procedure 4.4., at N 2. Still the plaintiff continues to be denied appropriate health care. 5. These medications albeit for the most part have little or no affective strength, are not being stocked in accordance with policies and procedures, causing plaintiff to go without any medication for migrsines, acid reflux disease, bleeding ulcers, etc.......

9. As time past, the plaintiff's medical conditions begin to worsen, due to all of the before mentioned reasons.

10. On June 25, 2002, plaintiff was call to meet a sick-call appointment at the prison's infirmary. Upon arriving plaintiff went through DOC, DCC medical providers medical personnel's screening process, in which he repeatedly told First L/P. Johnnie (last name unknown) and nursing assistant Georgannia Meekens secondly about his severe back problem.[6] Shortly thereafter, nurse practitioner Maggie Bailey overheard plaintiff complaint to Ms. Meekens and responded "he's not here for that. If he want's to be seen regarding his back, tell him to put in a sick-call" (quote unquote).

11. Following the screening process, the plaintiff's medical chart was passed on to Ms. Bailey. Who called him over to her examining area, and advised that he had been called up for medication renewal. Within five minutes or so Ms. Bailey had complete her med renewals and told the plaintiff that he could leave.

12. The plaintiff than ask Ms. Bailey would she attend to his back. Ms. Bailey then advised the plaintiff again that he had only been called for med renewals, and that she was sorry, but she could'nt do anything else for him until his sick-call for his back was processed.[7]

13. Nevertheless, Ms. Bailey opened a drawer to her right and handed the plaintiff a card of "Ibuprofen".[8] See attached exhibit (D)(1) and (D)(2)....

---

6. Prior to this sick-call appointment, plaintiff had submitted sick-calls regarding his continual back problems and had been physically bed-ridden prior to and during this time for four days, and thought that was why he had been called. 7. The plaintiff medical condition was very visible, noting that he was partially bent over, could'nt sit and walked very slowly. 8. Ms. Bailey actions was unusual because she knew of the plaintiff history of back problems. Likewise, she knew that the medications that were being given wasn't affective, and posed other dangers to him by either acting against other medications and causing liver and kidney damage.

19. The plaintiff was then again told he could leave. Indeed, Ms. Bailey conduct was irreprehensible and demonstrated a total disregard for his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976).

15. It also shows a denial to treat in a emergency. Id., a hostile attitude toward's medical treatment. Mullen v. Smith, 738 F.2d 317, 318-19 (8th Cir. 1984)(prisoner was subjected to ridicule and derision in response to complaint of pain and inability to walk); treatment without using professional judgment: Hughes v. Joliet Correctional Center, 931 F.2d 425, 428 (7th Cir. 1991)(medical staff were insufficiently interested in his health to take even minimal steps to guard against the possibility that the injury was serious).

16. On July 1, 2002, seven days after his first visit to the infirmary. He was called again for a sick-call appointment. At which time he was seen by Dr. Islegorie.

17. The plaintiff again informed Dr. Islegorie of his history of back problems and was ask what medications were he taking.

18. However, Dr. Islegorie didn't even attempt to conduct an examination and advised the plaintiff to "just keep taking the medications that he had been given. See attached exhibit (E)(1) and (E)(2).

19. On July 5, 2002, the plaintiff returned to the prison infirmary for the third time in eleven days, and was seen by Ms. Bailey. Who seemed aggravated that I was there again with the same complaint. Whereabout, she (Ms. Bailey) did little in the way of examining and responded. "I cant find anything wrong with you. Your muscle reflexes are good, may be you just need to get more exercise".

20. The plaintiff responded to Ms. Bailey by saying "so you think its all in my mind, huh?

21. Ms. Bailey then said "No, im not saying that. But every time I come here to work, I think im somewhere else".

22. The plaintiff then said to Ms. Bailey "look, so you think I just come up here to look at you-all. Its not like you-all see doing anything for me".

23. After expressing his opinion to Ms. Bailey, she then pulsed briefly and returned to the plaintiff's medical records, were at which time begin reviewing them.

24. Sometime thereafter, Ms. Bailey advised the plaintiff that because of the known Spinal Sclerosis and numerous complaints concerning additional back problems. Despite the lack of any evidence by x-rays of spinal cord injuries, she was going to put him on a pain managment drug named "Soma".

25. Ms. Bailey further explained to the plaintiff the she (Ms. Bailey) was only trying him on them for thirty days.[9]

26. Although plaintiff had finally found something that actually aided his back condition, medication was routinely sporadic due to:

(a) Inadequate record keeping on inmate meds, causing them to run out and waite sometimes three days to weeks before renewals are restocked;

(b) Medical personnel not qualified or properly trained to accurstely read prescriptions and depense medications;

(c) Medical personnel not prompt or timely in despensing medications as ordered by the physician; or

(d) Medical personnel simply forgetting to bring inmates medications when they come to each building.[10]

27. For almost the next full year plaintiff spent the majority of his time filing medical grievances, sick-calls and writting state, prison, medical and ACLU/DC1

---

9. The plaintiff was to take one 20mg tablet twice daily (mornings and nights, and only can be depensed by medical personnel). Ms. Bailey explained that after thirty days, she would re-evaluate his medical progress and if they "Soma" were working, she would keep him on them. In addition, Ms. Bailey also prescribed a muscle relaxer named "Feldene" to assist with muscle tension in his back. All further medication renewals would take place every ninety days. Note that when there was a episode of this happening, plaintiff's and others are always told (1) they will call for them to come up to the prison infiemsey to get it, and (2) if you are lock-down (referring to SHU or MHU housing units) they will bring it back. Rarely do iether ever happens. ....

9

officials regarding his medical care.

28. On May 21, 2003, the plaintiff submitted a sick-call demonstrating the problems stated in number's #26 and #27 of this complaint. See attached exhibit (F).[11]

29. Due to the continual maltreatment and disrespect by medical personnel (Thomas Chucks and Maggie Bailey), that plaintiff put the defendants on notice that he requested from that point on that both be prohibited from any form of medical treatment or contact.

30. Nonetheless, in violation of Title 11 Del. C. § 6536 citing Berry v. CMS., 1994 Del. Super. Lexis 219 at. 6 under Estelle, 429 U.S. at. 106., adopting Title 18 Del. C. § 6853 under "Battery" as have been defined by the Reinstatement (Second) of Torts, stating "an actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person.... and (b) a harmful or offensive contact with the person of the other directly or indirectly results." Brzoska, 668 A.2d 1355, 1355, 1360 (Del. 1995) (quoting Reinstatement (Second) of Torts § 18 (1965); W. Page Keeton, et. al. Prosser and Keeton on Torts § 9 at. 39 (5th ed 1984) (A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or third person to suffer such a contact, or apprehension that such contact is imminent, is a battery"). The defendant's conduct explicitly defines "civil battery".

31. In October of 2003, the plaintiff was seen and fully examined by Dr. Brown after submitting a sick-call regarding all of his health conditions.[12]

---

11. Its evident the problems with DOC, DCC medical provider's medical care regarding inmate medical needs. Note that eventhough there's an alleged policy or procedure to accurately monitors inmates medications, informs when renewals are do notifying medical personnel to order prescriptions if renewals are warranted. The policy or procedure also is suppose to keep current updated medical records, so that inmate do not have to waite until medications runs out to get seen by a physician. Its also duely noticable that medical conditions often are change in their standard of care under "Chronic" care. In addition to having been seen by these different medical practitioners from May 1, 2003, through the 21st.

32. Despite plaintiff continued efforts with the defendant's DOC, DCC, and CMS, et al., to get proper medical treatment. He still has not! See example, attached exhibit (G)(1) and (G)(2) (last page omitted) no reference to medical claim.

33. On January 5, 2007, plaintiff was seen by Dr. Fredderick Vandusen regarding all his medical problems. Dr. Vandusen learned after studying plaintiff's medical records, that there had been an oversight on my M.R.I. reading done by Dr. Burns earlier. And confirmed the medical diagnosis of my other back conditions and added that there was a bulge pressing against the plaintiff's spinal cord.

34. Because of this bulge, plaintiff would undergo feeling additional painful conditions caused by it.

35. Like each of every other doctor that has reviewed plaintiff's medical records and examined him, have all said that CMS medical treatments were inadequate to his needs as follows:

(A) Inderal, given as migraine headache medication. Is FDA approved only for high-blood pressure; and

(b) Neurontin, given as a muscle relaxer. Is FDA approved only for Epilepsy. And had been determine that it should not be marketed for any other medical condition. See attached exhibit (H)

36. The side affects of iethier of these drugs when used in treating a person for other conditions than what they are made for are _clinicially_ unknown to the defendants and shouldn't be given for any other usage.

---

12. In relating back to exhibit (A), Dr. Brown upon reviewing plaintiff medical history found that in his file was x-rays that had been conducted a few months earlier, that had plaintiff believes ordered by Dr. Teevedi. The x-rays revealed that in addition to plaintiff's known back condition, that he had additionally (a) a non-mending fractured lower left vertibra, and (b) a herniated disc. To which plaintiff's medication for pain managment "Soma" was increased to 40mg twice daily, and told that basically that all other meds were not affective or not ment for his conditions. She changed what she could, other asspects of Dr. Brown's actions taken have already been discussed.

11

37. Little argument can exist against the facts, thus submitted that will dismiss the plaintiff's claim of denial of medical treatment, for his serious medical needs.

38. In Farmer v. Brennan, the U.S. Supreme Court has not specifically identified what "deliberate indifference" entails. However, case law clearly indicates that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. Id. 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

38. The 8th Amendment placed several limits on state power. In so doing it has outlawed all criminal punishment that as in this case, "involve unnecessary and wanton infliction of pain". Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

39. The plaintiff contends that "pain" is present whenever an inmate is forced to bear the untreated consequences of a serious medical problem. Denial of medical care is "cruel and unusual" because it can result in physical torture, or pain "without serving a penological purpose. Rhodes v. Chapman, supra, 101 S.Ct. at 2399.

40. The instant case demonstrates "deliberate indifference" and is reflected by their systematic deficiencies in their staff, and facilities procedures or policies which makes unnecessary suffering inevitable. Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977). Compare to attached exhibit (1) (Delaware Dept of Corrections, Action Plan).[13]

41. This Plan was developed in accordance with the December 29, 2006, Memorandum of Agreement Between the State of Delaware and the U.S. Dept of Justice.

42. The test for "deliberate indifference" has been approved and followed in decisions: Ramos v. Lamm, supra, 639 F.2d at 575; Ruiz v. Estelle, supra, 503 F. Supp. at 1330; Lightfoot v. Walker, supra, 486 F. Supp. at 509; Palmigiano v. Garrahy, 443 F. Supp. 984 (D.R.I. 1977).

43. Complicating matters even worse is the outside interference and/or interruptions as:

(A) Unconstitutional Grievance Hearings.

   -Under current practice, all medical grievances are entered through the

12.

regular grievance channels allowing non-medical personnel who are DOC/DCC officers and administrative officials.

44. That through the practice gives them uncensored access to review confidential and private information.

45. In addition, they (Michael McCreanor and Michael Dutton) as grievance officials randomly pick and choose which medical grievance will allowed to be heared.

46. If official do not like your medical grievance when submitted, they will reject them and return to send with their own answer, as if it was a regular grievance

47. These same officers or officials sit-in on all medical grievance, and are known for exercising authority that isn't enforceable in these settings interrupting grievance hearing and dismissing grievants for whatever reasons he feel.

48. Delaware Center for Justice (DCJ) and Delaware American Civil Liberties Union are actors involved in DOC/DCC's medical decisions with or without inmates consent. As well as picking and choosing whom they are willing to help.

49. Any and all other defendants cited all sought in their official and individual capacities, by iethere knowledge and aquaintance, personal participation or failed to act to known 8th Amendment violations, etc. Estelle, 429 U.S. 97, 106, 97, S.Ct. 285, 50 L.Ed.2d 251 (1976); White v. Napoleon, 897 F.2d 103, 109 (3rd Cir. 1990); and West v. Keve, 571 F.2d 158, 161 (3rd Cir. 1978).

13.

The question of personal liability as to A.C.L.U, and DCA is found through their involvement with (DOC/DCC) and (CMS) regarding ongoing inmate medical claims. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)(Defendants knew of a need to take action but consciously chose not to do so), see also Rouse v. Plantier, 182 F.3d at 200 (requiring personal involvement in the alleged misconduct); accord to Hemmings v. Gorczyk, 134 F.3d 104, 109 n. *4 (2d Cir. 1998) are only a few examples showing their person involvement alone through official acts of mediation. The Supreme Court has made it clear that the standards against which a court measures that prison conditions are "the evolving standards of decency that mark the progress of a maturing society" and not the standards in effect when the Farmers drafted the Eighth Amendment)(Emphasis on original). Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Wherefore, the Plaintiff, James Arthur Biggins, demands judgment against Defendants Ruth Ann Minner, and the State of Delaware, et al.; Carl C. Danberg and the Delaware Dept of Corrections, et al.; Thomas Carroll/Elizabeth Burris and the Delaware Correctional Center, et al.; Kenneth Ivens/John Rundle and Correctional Medical Services, Inc., et al.; Judith Mellen and the Delaware Center for Justice, et al.; Janet Laban and the Delaware Chapter of the American Civil Liberties Union, et al., and all their John Doe and Jane Doe employees granting relief as following:

  A. Declaratory Relief as appropriate to each defendant;

  B. Compensatory Relief in the amounts: $10,000,000 (Ten Million Dollars) jointly and severally against all Defendants currently named and unnamed in this action;

  C. Hedonic Award Relief in the amounts: $5,000,000 (Five Million Dollars) jointly and severally against all Defendants named and unnamed for pain and suffering, and loss of pleasurable activities over the course of time;

  D. Punitive Award Relief in the amounts: $20,000,000 (Twenty Million Dollars) jointly and severally against all Defendants named and unnamed for the continual deprivation of adequate medical treatment, emotional and physical stress

.And pain and suffering, caused at the hand of the Defendants deliberate indifferences, and making conscious decisions denying to Plaintiff proper and adequate medical treatment for his serious medical needs for chronic illnesses;

    E. Injunctive Relief in the following (A) issue a Temporary Restraining Order (TRO) immediately stopping all unnecessary forms of current ineffective treatment on the Plaintiff that is known by the Defendants, and following course of treatment prescribed and approved by than Bureau Chief: Paul Howard, until further review can be determined, (b) issue and order preventing (DCC) law library personnel from extracting documents from Plaintiff's photocopy requests "allegedly" as being prohibited. Meola v. Fitzpatrick, 322 F. Supp. 878 (D.C. Mass. 1971) (There is no valid reason in prison officials screening and controlling the content of court papers sufficiently compelling so as to limit a prisoner's constitutional right to free and unfettered access to the courts, and that such censorship violated the First Amendment. The fact that prisoner's may exaggerate about prison conditions and make false allegations against prison officials cannot, said the court, justify prison officials reviewing and censoring the contents of an inmate's correspondence with the courts);

    F. Any Other Relief that the Court deems appropriate.

Date: December 29          , 2007

James Arthur Biggins #314264
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

12.

DCC  Delaware Correctional Center       Date: 12/29/2004
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE REPORT

| | | | |
|---|---|---|---|
| Offender Name : BIGGINS, JAMES A | SBI# : 00319264 | Institution : DCC | |
| Grievance # : 5985 | Grievance Date : 08/04/2004 | Category : Individual | |
| Status : Resolved | Resolution Status : Level 3 | Resol. Date : 12/29/2004 | |
| Grievance Type: Health Issue (Medical) | Incident Date : 11/21/1997 | Incident Time : | |
| IGC : Merson, Lise M | Housing Location : Bldg E, Tier B, Cell 8, Top | | |

Description of Complaint: (degenerated spin decease): have been on the the med depts chronic care patient since I begin my sentence here at DCC dated 11/21/97. Durning which i've raised several complaints over the years to the three different medical providers and their administrators regarding the inadequate or non treatment of my spinal condition. These complaints involved mis diagnosed x-rays, denial of treatment, condition needs, and proper medication for pain. In or about April of 2004, following the consideration of a letter of complaint sent to Bureau Chief: Kathy English. Chief Physician: Ali was ordered to review my condition and treatment. Due to displeasure of being ordered, Dctr:Ali, hastly examined me in less than 5 minutes, denied me of any additional medical needs which was approved by Dctr:Brown suchas a bottom bunk(despite two seperate medical memo's being issued and are recorded in my medical file), sneakers, or boots at medical expense to support my arch and back, a brace, and stopped the prescribed medication given to me for pain. While admitting that not only did I suffer with the condition, non of the above medical attention or aids were need, as well as admitting that my condition worsens as I age. Because of the discontinuation of the pain medication, i've remained daily in pain, suffering as well with numness of joints and weakness in knees, sometime failing or stumbling trying to get down off the top bunk. On 7/30/04, I was scheduled to see Dctr:Ihoma. While waiting to see her, she came through and said to me "Mr. Biggins. If you think i'm going to put you back on that pain medication, am not." I asked her could she make me an appointment to see Dctr:Ali again, she said she would. Please note that she reasoned her opinion without even seeing me, but instead had remembered my recent sick call request complaint.(copy of sick call slip attached to grievance) On 8/3/04, I was seen by Dctr.Travedi. While I did not discuss with him all of my current on going medical problems. I did discuss with him the above and express my difficulties of climbing off the top bunk. Dctr:Trevedi agreed that the feldene was for pain, it's for muscle inflamation. He further told me that they don't issue bottom bunks to inmates with back problems. I would have to have a back operation or something. Note further that the reasons to denied me adequate medical treatment continues to change This is just one more excuse. As for as pain medication, he ordered me regular tylenol 500mg. it is recorded as well as in my medical record over the years i've been given this, and other forms of over the counter medication to no effect for my back pain.

Remedy Requested  :  would like to receive the proper medical treatment for my needs in accordance with the condition of my complaint as list herein.

| Type | SBI # | Name |
|---|---|---|
| | | |

| | |
|---|---|
| Medical Grievance : YES | Date Received by Medical Unit : 08/17/2004 |
| Investigation Sent : 08/17/2004 | Investigation Sent To : Hastings, Terry L |
| Grievance Amount : | |

Ex (A)

DEPARTMENT OF CORRECTION
Bureau of Prisons
245 McKee Road
Dover, Delaware 19904

December 20, 2004

Inmate BIGGINS JAMES A        $E$    $B-8$
SBI # 00319264
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JAMES BIGGINS:

We have reviewed your Grievance Case # 5985 dated 08/04/2004.

Based upon the documentation presented for our review, we uphold your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by
BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Paul W. Howard
Bureau Chief

$Ex(B)$

**DEPARTMENT OF CORRECTION**
Bureau of Prisons
245 McKee Road
Dover, Delaware 19904

October 27, 2006

Inmate BIGGINS JAMES A
SBI # 00319264
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JAMES BIGGINS:

We have reviewed your Grievance Case # 36763 dated 04/26/2006.

Based upon the documentation presented for our review, we uphold your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Paul W. Howard
Bureau Chief

4. The State of Delaware Bureau of Prisons has established an Inmate Grievance Procedure whereby "[e]very inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed." DOC Policy 4.4 (revised May 15, 1998). With certain exceptions, DOC Policy 4.4, Part V provides for a three-tier system of review of inmate grievances. Initially, after a written grievance is submitted to the Inmate Grievance Chair ("IGC"), investigation into the matter will be initiated and informal resolution attempted. If informal resolution is unsuccessful, the Resident Grievance Committee ("RCG") will convene and a hearing will be held, culminating in a recommendation which is forwarded to the Warden or his designee ("Warden"). If the Warden and the grievant concur with the RCG recommendation, the IGC closes the file and monitors issues of compliance. If the parties do not concur, the matter is referred to the Bureau Grievance Officer ("BGO"), who reviews the file. If the BGO concurs with the Warden's decision and the Bureau Chief of Prisons accepts the BGO's recommendation, the IGC closes the file and monitors compliance. Alternatively, the BGO can attempt mediation between the grievant and the Warden or recommend Outside Review of the matter.

5. DOC Policy 4.4 provides that medical grievances are to be submitted to the ICG, who will forward the grievance to the

3

medical services contractual staff for review.    The medical
services contractual staff will attempt informal resolution of
the matter.   If such resolution fails, a Medical Grievance
Committee ("MGC") hearing will be conducted, which hearing will
be attended by the grievant and the IGC.   If the matter is
resolved at this stage, the case is closed; otherwise, the
grievant is directed to complete the MGC Appeal Statement section
of the written grievance and forward it to the IGC.    The IGC in
turn forwards the file to the BGO who, after review of the
matter, will recommend a course of action to the Bureau Chief of
Prisons.   The Bureau Chief of Prisons is charged with rendering a
final decision.

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: Delaware Correctional Center

DATE SUBMITTED: June 25, 2002

INMATE'S NAME: James Arthur Biggins

SBI#: 00319264

HOUSING UNIT: D-West /C-19

CASE #: _____

////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: 2:10 pm or so;

TYPE OF MEDICAL PROBLEM: On the above date, on or about the above time, 1 was at the Hospital for a scheduled appointment. Upon being accepted by (Nurse: Johnie), 1 advised her that 1 also wished to be seen by the doctor, because my back had been out since Monday evening. She was further advised by me, that as the result 1 hadn't sleap since Sunday night because of the constant pain, and 1 had been chewing up my pain pills (Naprosyn) and they was'nt doing any good! Upon being seen by (Nurse: Georgia-Ann) for vitals, this information was repeated. At which (N/P: Meggie Bailey) over heard my complaint, and responded by telling (Nurse: Georgia-Ann) to tell me to "put in a separate sick-call to be seen." When 1 was leaving, she had given me a card of 400mg (Ibuprofen). With the above already known to her, certainly any 400mg pills was'nt going to do me any good when i've been

Cont →

GRIEVANT'S SIGNATURE: James Arthur Biggins

DATE: June 25, 2002

ACTION REQUESTED BY GRIEVANT: 1 would like an investigation into the practices, Correctional Medical Services, and a change of their practices

DATE RECEIVED BY MEDICAL UNIT: _____

RECEIVED
JUN 2 6 2002
Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

Ex A)(1)

chewing up 500mg pain pills and having no results! By anyone's definition of a serious medical condition, mine qualifies by all accounts. Furthermore, it is a shame and ridiculous to have experince just how negligent these presumed qualified, experinced professional medical personnel the Dept of Correction and Delaware Correctional Center has contracted to provide for those under its care medical needs. There is niether a logical, rational or reasonable explanation that can be given for this inepted conduct and behavior. Eventhough, I have done as requested and placed another sick-call to been seen. Can anyone reasonably tell me just how many more days it will take to get my name on the next sick-call list?

Without any doubt, it will not be before Thursday or Friday at the earliest. That means, i'll have to wait 4 days to be seen for something under any set of terms cant be seen as nothing but an Emergency Medical Condition. I note that my condition was visible a mile away, and there is no denying the fact that Im in serious pain!

Ex(D)(2)

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: Delaware Correctional Center

DATE SUBMITTED: July 1, 2002

INMATE'S NAME: James Arthur Biggins

SBI#: 00319264

HOUSING UNIT: D-West /C-19

CASE #:

////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: Continual

TYPE OF MEDICAL PROBLEM: This my second medical grievance since last Tuesday (June 25, 2002) regarding the denial and inadequacies of this institutions medical care for me. Assuredly youre memory also reflects this as well Mrs. Merson! Although I did get back to the hospital for sick-call, the day after filing my initial medical grievance in regards to my (back). I can honestly say nothing was done. The only thing Dr. Aligorie told me was to continue to take the pills. As I so disparately tried to explain to him, i've been taking both (Naproxen 500mg, and I buprophen 400mg) all together and they has no effect on my back. He basically told me that there was nothing else he could do. To date i've eaten two (2) cards of meds, as if its candy and
Cont →

GRIEVANT'S SIGNATURE: James Arthur Biggins          DATE: July 1, 2002

ACTION REQUESTED BY GRIEVANT: Would like an investigation into the medical neglect of treatment towards me.

RECEIVED

JUL 0 8 2002

Inmate Grievance Office

DATE RECEIVED BY MEDICAL UNIT: _____

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

Ex(E)(1)

Nothing has changed. In fact to a higher degree, my (back pain) is worse As of right now, im on my third card of meds which 1 just got friday (June 28, 2002). Out of that card of thirty (30) (Naproxen 500mg), 1 have 18 left.

There no excuse for me having to take this excessive amount of medication like this, and im hurting myself. Furthermore, im creating most likily another health issue. But at least 1 have a little mobility And just not bed-ridden. No matter, something need to be done to get me proper treatment. Im placing another sick-call also today, hopefully when im seen the treatment will not be the same.

Ex(E)(1)

## DELAWARE DEPARTMENT OF CORRECTIONS
## REQUEST FOR MEDICAL/DENTAL SICK CALL SERVICES
## FACILITY: DELAWARE CORRECTIONAL CENTER
### This request is for (circle one): (MEDICAL) DENTAL  MENTAL HEALTH

James Arthur Biggins
Name (Print)

C/Building
Housing Location

May 11, 1962
Date of Birth

00319264
SBI Number

May 21, 2003
Date Submitted

Complaint (What type of problem are you having?) I NEED to be SEEN A.S.A.P. for the RENEWAL of my Chronic-Care Meds (Soma, Naprosyn, and Zantac). Prescriptions ended Sunday, May 18, 200_ no one notified me ahead of time. As my legal right, I wish not to been SEEN by either Doc or's Bailey or thum Chucks. They have continuously been disrespectfully & without conce for my health and display bad demeanors as professionals.

James Arthur Biggins
Inmate Signature

May 21, 2003
Date

**The below area is for medical use only. Please do not write any further.**

S: 5/26/03. The above listed medications are not "Chronic Care Meds". Your Zantac order is good

O: Temp:____  Pulse:____  Resp:____  B/P:____  WT:____

until 6/3/03. (Renewed on 4/3/03 for 60 days by Dr Thuedi).

A: You were seen on 5/21/03 by Dr Hague he could have renewed the other meds at

P: that visit, if you asked him. You will be scheduled again to see medical (Haque or ___)

E:

MAY 22 2003

_____          _____
Provider Signature & Title          Date & Time

3/1/99 DE01
FORM#:
MED
263

Ex(F)

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: Delaware Correctional Center

INMATE'S NAME: James A. Biggins

HOUSING UNIT: F-Building

DATE SUBMITTED: April 14, 2004

SBI#: 319264

CASE #: _____

///////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: On-Going

TYPE OF MEDICAL PROBLEM: Since my initial incarceration here at (D.C.C), I have continuously been denied proper and adequate medical and dental treatment by this facility's medical care providers (P.H.S, C.M.S, and now F.M.S) begining November 21, 1997. My first complaint is the lack of care and treatment for degenerate spine decease, in which over the course of time 1 have repeatedly been seen with little results. It was'nt until October of 2003, was 1 officially declared to have this condition due to finally an accurate X-Ray reading after undergoing several of the years 1 had been repeatedly told that my back hurted from the lack of exercise and nothing else. My personal information giving to them regarding the extensive history of back—

GRIEVANT'S SIGNATURE: James Arthur Biggins      DATE: April 14, 2004

ACTION REQUESTED BY GRIEVANT: That the parties involved resolve this issues through the proper attention and treatment for each as explained herein the grievance.

DATE RECEIVED BY MEDICAL UNIT: _____

**RECEIVED**

APR 2 2 2004

Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

Ex(B)(1)

trouble and prior medications taken was all ignored. Nonetheless, despite now having adequate diagnoses of my condition and Dr. Brown's observation of what is need to treat me, and relieve chronic pain from this condition of my back and numness of such joints as (knees, ankles, and feet) continue to be denied. That treatment has been determined to be a <u>bottom bunk</u>, to which their has been the release of two (2) medical memo's requesting this to the Security Chief (Mjr. D. Holman) to my knowledge, to ease the tension on my back of having to jump up and down off the top bunk. On April 12, 2004, I seen Dr. Thoma for renewal of my Chronic Care medition and again brought this again to her attention. She told me that "we do not give bottom bunks to inmates anylonger, unless they have ceasures". Each time im either told something different or they add new reasons. This issue has also been presented to the administration by my building counselor (Kennieth Melbourne), in addition to my personal letters of the same to D/W: Burris, Warden: Carroll, and Management Services Bureau Chief: Kathy English. Dr. Brown further requested that I should receive additional footwear for the same reasons. I've also have had several discussions with the Medical Support Admin: Gina, who has not only acknowledged her awareness for my treatment, but has as well told me that she had approved the footwear and was waiting on Delaware Correctional Center's Support Services Mngr: Joseph Hudson to supply them (This was in Febuary since our last conversation). I find it <u>unreasonable</u> and a <u>deliberate indifference</u> for the welfare of my health that the Medical Depaetment or Delaware Correctional Center's Administrative Officials either separately or collectively cannot meet my medical needs, but provide with less reason treatment of those with less conditions that which they need.

Ex.(GX2)

5/8/07 U.S.A. Today

# Crackdown on illegal tactics
# for marketing only goes so far

## Fines lack bite for pharmaceutical companies making billions

**By DENISE LAVOIE**
Associated Press

BOSTON — U.S. District Court Judge Patti Saris had seen cases like this before, and she was fed up.

Another pharmaceutical company was in her court, waiting to be slapped with a multimillion dollar fine for marketing its drugs for uses that had not been approved by the federal Food & Drug Administration.

"You can't thumb your nose at the FDA," Saris said. She sentenced Schering Sales Corp. and its parent company, Schering-Plough Corp., earlier this year to pay $435 million to settle allegations it lied to the government about drug prices and illegally promoted the drugs Temodar and Intron A for the treatment of cancers for which they were not approved.

Although doctors are free to prescribe drugs for uses that have not been approved by the FDA, pharmaceutical companies are prohibited by law from marketing drugs for so-called "off-label" uses.

Some industry representatives say the law that prohibits illegal marketing and the affiliated FDA regulations are open to different interpretations and are selectively enforced.

During the last decade, federal prosecutors across the country have aggressively targeted drug companies, including AstraZeneca, Pfizer Inc. and Eli Lilly & Co., for illegal marketing activities. Just this week, Purdue Pharma, the maker of the painkiller OxyContin, agreed to pay $19.5 million to 26 states to settle off-label marketing allegations.

Since 1997, when the Justice Department began receiving funding earmarked for fighting health care fraud, the federal government has collected $11.82 billion in fines for various violations and returned the money to Medicare, Medicaid and other health care programs.

Critics of off-label marketing say drug makers continue to do it for one



**David Franklin blew the whistle on Pfizer Inc., which promoted its epilepsy drug Neurotin for pain and psychiatric uses.**

## ASTRAZENECA PROBED

AstraZeneca PLC disclosed in its 2006 annual report that the U.S. Attorney's Office in Philadelphia is reviewing the company's sales and marketing practices related to its Seroquel drug for schizophrenia and bipolar disorder, including allegations that the company promoted Seroquel for non-indicated (off-label) uses.

AstraZeneca, which has its U.S. headquarters in Fairfax, was notified of the investigation in 2006, said Jim Minnick, a company spokesman.

"We are cooperating with the U.S. Attorney's Office," Minnick said.

simple reason: profits. Even when drug makers are forced to pay huge fines, the amounts are small when compared with the money that can be made by promoting drugs for off-label uses.

In 2004, Pfizer paid $430 million in fines to settle allegations it marketed the epilepsy drug Neurotin for pain and psychiatric illnesses. David Franklin, a medical liaison who became a whistle-blower, said that even after the settlement — one of the largest of its kind — doctors told him that other pharmaceutical companies were still actively promoting their drugs for off-label uses.

The $430 million penalty was widely referred to as a slap on the

wrist, Franklin said.

Sales of Neurotin reached nearly $2.7 billion in 2003, a year before the fines, which settled charges that Warner-Lambert — a company Pfizer bought in 2000 — flew doctors to lavish resorts and paid them big speaking fees to hype Neurotin.

Many of the cases begin with a lawsuit filed by a whistle-blower like Franklin. Under the federal False Claims Act, private citizens can sue on behalf of the government and receive a portion of fines in cases where companies defraud the government, including cases in which Medicare and Medicaid are charged for these off-label prescriptions. Franklin received $26.6 million.

Some of the biggest pharmaceutical companies — including Schering, Serono Laboratories and Pfizer — have been prosecuted in Boston, where the U.S. Attorney's Office has one of the most aggressive health care fraud units in the country. Boston gained a reputation after a record $875 million fine was handed out against TAP Pharmaceutical Products in 2001 to settle allegations it inflated prices and bribed doctors to prescribe its prostate cancer drug Lupron.

Thomas Abrams, director of FDA's Division of Drug Marketing, Advertising and Communications, said it is dangerous for pharmaceutical companies to promote nonapproved uses. When drug companies do that, "it circumvents the FDA approval process and could lead to doctors prescribing drugs for uses that are not safe or effective."

The promotion is done in various ways — by drug company representatives during visits to doctors' offices, at medical conferences and seminars, and by funding research that is featured in medical journals.

Pharmaceutical companies say they have put strict programs in place over the last few years to train their employees to comply with the FDA regulations.

Ex(H)

# The State of Delaware

# Department of Correction

# Action Plan

## April 30, 2007

# Delaware Department of Correction
## Action Plan

### I.    Introduction

This Action Plan has been developed in accordance with the December 29, 2006 Memorandum of Agreement Between the State of Delaware and the United States Department of Justice (the MOA). In particular, paragraph 65 of the MOA requires the State to submit a "comprehensive action plan" to the United States identifying the specific measures the State intends to take in order to bring four Department of Correction facilities[1] into compliance with each paragraph of the MOA containing substantive requirements relating to three general areas:  Medical and Mental Health Care, Suicide Prevention, and Quality Assurance. As is required by paragraph 65, each item addressed in the Action Plan contains a timeline for completion.

The measures described in this Action Plan are intended to provide the United States Department of Justice (the DOJ) with a roadmap of specific remedial steps to be taken by the Delaware Department of Correction (the DOC). The Action Plan has been developed with an emphasis on achievable, realistic, and, in most cases, incremental steps towards full compliance. All measures described here have been developed with the expectation that the DOC will ultimately meet or exceed requirements of the MOA and generally accepted professional standards, such as those published by the National Commission on Correctional Health Care (NCCHC).

The Action Plan is organized so that paragraph numbers refer to corresponding paragraphs in Sections III through V of the MOA. "Timeline for Completion" references in each section indicate the date by which the DOC expects to have fully implemented the proposed actions. Target deadlines for achieving incremental steps towards full compliance are also noted where appropriate. Most of the efforts described in this Action Plan will require continuing attention. To the extent that an effort does not have any defined endpoint or deadline for completion, it is noted to be "continuing."

As will be described more fully in the DOC's first Compliance Report, substantial work has already begun on many of the MOA requirements, and many improvements in the quality of inmate care are already apparent. However, most of the substantive MOA provisions discussed here involve the development or revision of policies and procedures. The corresponding sections of this Action Plan necessarily reflect a certain level of generality, because those policies and procedures are not yet complete.  In those cases, the Action Plan:

---

[1] The Delaware DOC facilities covered by the MOA are the Delores J. Baylor Women's Correctional Institution (Baylor); the Delaware Correctional Center (DCC); the Howard R. Young Correctional Institution (HRYCi); and the Sussex Correctional Institution (SCI) (collectively, the "Facilities").

- addresses each substantive requirement;
- affirms the DOC's commitment to completing the work necessary to establish appropriate policies and procedures;
- identifies the entities or individuals responsible for achieving compliance with the underlying substantive issues;
- identifies those areas in which auditing and quality improvement efforts will be concentrated in order to assure that new policies and procedures are achieving the desired result; and
- establishes timelines for training staff on new policies and procedures, performing quality assurance, and achieving full compliance.

The MOA compliance officer will have global responsibility for assuring compliance with the MOA.

## II.    Medical and Mental Health Care

### 1.    Standard

All of the steps described in the pages that follow are designed to satisfy the ultimate, most fundamental requirement of the MOA: ensuring that services provided by the State address the serious medical and mental health needs of inmates in a manner that satisfies generally accepted professional standards. To accomplish this, the DOC plans to:

- diligently pursue compliance with each substantive provision of the MOA;
- rely on a multi-disciplinary, problem-solving approach to identify and overcome obstacles to improvement;
- solicit the advice of experts and consultants, where appropriate; and
- refer to NCCHC or other appropriate correctional health care standards when evaluating the services provided to inmates.

Timeline for Completion: Continuing

### 2.    Policies and Procedures

The DOC is currently drafting and revising DOC policies and procedures that will eventually replace those currently provided by the medical vendor. In the event of vendor turnover or a transition to self-operation of DOC health care services, stand-alone DOC policies will provide continuity in both the standards of care and the performance expected of staff.

- Some of the most critical policies are identified in the MOA, and relate to intake, communicable disease screening, sick call, chronic disease management, medication delivery, laboratory testing, acute care, infection control, infirmary care, and dental care. The DOC will focus its initial efforts on these most essential policies.

- The DOC will continue seeking policies and procedures from correctional facilities in other jurisdictions in an attempt to identify good models for its own manuals.

- Individuals with appropriate experience in mental health, quality assurance, medical, and nursing protocols are being assigned responsibility for drafting DOC policies and procedures, including the Director of Health Services, Mental Health Treatment Program Administrator, and the Quality Improvement Administrator

- Policies and procedures will also be subject to review and comment by the Deputy Attorney General and DOC Bureau of Prisons Chief.

4

• The DOC will continually review and update policies and procedures as needed. At a minimum, a yearly review will be conducted by the Office of Health Services.

### Timeline for Completion:

The critical policies and procedures identified above will be drafted and available for DOJ review by 07/01/07.

Additional policies and procedures will be promulgated as needed throughout the term of the MOA, and on a continuing basis thereafter.

As noted above, policies will be continually updated as needed. A yearly review will take place, with the first yearly review to be completed by 07/01/08.

## 3. Record keeping

### 3a. Develop and Implement Unitary Record Keeping System

The DOC currently has a unitary system that includes both medical and mental health records. This paper medical record will be available to practitioners who need access to the record for treatment, quality assurance, and auditing purposes. The DOC also plans to issue a Request For Proposals during the next fiscal year to evaluate the feasibility, costs, and benefits of an electronic medical record ("EMR").

Additionally, the DOC plans substantial improvements in the integration of medical and mental health information contained in the Delaware Automated Correction System (DACS) records. These efforts began in April 2006, and are continuing. Jim Welch, Joyce Talley, the Mental Health Treatment Program Administrator, the medical vendor, and individuals from the Delaware Management Information Systems department will continue working on enhancements to the Health and Medical Modules of DACS.

The DACS software vendor has been provided with a list of 178 requirements for improvements to the following 12 system functions in the Health and Medical Modules:

- Intake Screening
- Scheduling
- Medical Transfers
- Chronic Care
- Sick Call
- Outside Consults
- Pregnancy
- Mental Health
- Administrative Segregation
- Infirmary Care

- Dental
- General/Reports

Timeline for Completion:

Software development: approximately 6/18/07
System testing: 6/07 - 7/07
Revisions: 8/07
Training vendor and DOC staff: 8/07 - 9/07
Full implementation: 10/30/07
Issuance of RFP for an EMR: 7/01/08

### 3b.    Medical Records Staffing

The DOC will facilitate the provision of additional medical records staffing to reduce the potential for significant lags in filing records in the patient's medical record.

Timeline for Completion:

DOC will evaluate current medical records staffing and the need for additional staff by 4/1/07 (completed).

DOC negotiated an amendment to its agreement with the current medical vendor to provide for additional medical records staff, and staff are expected to be hired by no later than 10/30/07.

### 4.    Medication and Laboratory Orders

### 4a.    Policies, Procedures, and Practices for Medication and Laboratory Orders

Policies and procedures relating to medication and laboratory orders will be included in review and drafting process described in ¶ 2, above.

Timeline for Completion:

Policies: 07/01/07

### 4b.    Periodic Evaluation

The DOC has begun and is continuing to develop an auditing system to assure that medications are ordered and delivered in a timely manner. The auditing system will also assure that laboratory orders are taken off the chart, and tests ordered are completed and results reported to the ordering practitioner in a timely manner. This process will include continued monitoring under the DOC's audit system.

6

Timeline for Completion:

Full development of medication audit system:  10/30/07
Auditing:  Continuing

### *Staffing and Training*

**5.    Job Descriptions and Licensure**

   **5a.    Appropriate Licensing/Certification of Medical and Mental Health
   Staff**

   The DOC will ensure that any person requiring a license or certification to
practice under State law has the necessary credentials prior to employment.

- The vendor will be required to submit documentation regarding a prospective
  employee's licensure or certification to the DOC before the individual begins
  working at the Facilities.
- The licensure and certification list will be updated monthly by the medical
  vendor and submitted to the senior fiscal officer for the DOC, who will be
  responsible for reviewing the list and responding to any deficiencies.

Timeline for Completion:

Policies:  07/01/07

   **5b.    Establish Credentialing Program**

   The DOC will establish a credentialing program to ensure that all licensed and
certified staff have satisfied initial education requirements, as well as any continuing
education standards set by the relevant licensing and credentialing bodies.

Timeline for Completion:  01/01/08

**6.    Staffing**

The DOC plans to continue assessing staffing levels and to enter into negotiations when
necessary for additional clinical and non-clinical positions. The Director of Health
Services and the medical vendor share responsibility for compliance with this provision.

- An additional 14.33 FTE mental health staff and 24.82 FTE medical staff are
  scheduled to be hired because of staffing increases negotiated in April 2007
  with the current medical vendor.

7

- The DOC will continue evaluating staffing alternatives and options for contending with a serious local and national shortage of qualified nurses.
- DOC will continue efforts to identify and hire qualified individuals to fill the following new positions established in the Office of Health Services:
  o MOA Compliance Officer;
  o Quality Improvement Administrator
  o Administrative Specialist
  o Nurse Practitioner; and
  o Physician

Timeline for Completion: Continuing

## 7.    Medical and Mental Health Staff Management

The medical vendor has been delegated responsibility for assuring compliance with this provision.

### 7a.    Full-Time Medical Director

A full time Medical Director is in place, provided by the contracted medical vendor.

Timeline for Completion: Completed

### 7b.    Director of Nursing

A full time Director of Nursing is in place, provided by the contracted medical vendor.

Timeline for Completion: Completed

### 7c.    Administrative Medical and Mental Health Management

A full time Mental Health Director is in place, provided by the contracted medical vendor. The DOC will facilitate the hiring of additional administrative management staff. This will occur through increased staffing levels negotiated in April 2007 with the current vendor.

Timeline for Completion:

Hiring additional administrative staff: 10/30/07

### 7d.    Facility Clinical Director of Mental Health

8

On site clinical mental health director positions are currently established and staffed at each of the facilities.

Timeline for Completion: Completed

## 8.    Medical and Mental Health Staff Training

The Mental Health Treatment Services Administrator, Director of Health Services, the medical vendor, and the Educational Development Center ("EDC") will share responsibility for compliance with requirements in this provision.

### 8a.    Training to Meet Serious Medical and Mental Health Needs

- Initial and in-service training activities will continue to be scheduled by the vendor to provide mental health and special needs medical and mental health populations training.
- Documentation of training and copies of training materials will be available for examination.

Timeline for Completion: 01/01/08

### 8b.    Suicide Prevention

- Qualified mental health professionals will obtain Monitor approval of a curriculum for training on suicide prevention, as described in ¶ 42 below.
- Documentation of attendance at suicide prevention training, as described in ¶ 43 below, will be available for examination.

Timeline for Completion: 01/01/08

### 8c.    Identification and Care of Inmates With Mental Disorders

- Training for medical and mental health staff on the identification and care of inmates with mental health disorders will continue to be provided by the vendor.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services and the EDC will work together to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion: 01/01/08

## 9.    Security Staff Training

The Director of Health Services, Mental Health Treatment Program Administrator, the medical vendor, and the EDC will share responsibility for compliance with requirements in this provision.

### 9a. Identification, Referral, and Supervision of Inmates with Serious Medical and Mental Health Needs

- Training in the identification, referral, and supervision of inmates with serious medical and mental health needs will continue to be provided by the vendor.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services and the EDC will work together to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion: 07/01/08

### 9b. Additional Mental Health Training for Staff Assigned to Mental Health Units

- The medical vendor will continue to provide training to staff assigned to work in mental health units.
- Documentation of training and copies of training materials will be available for examination.
- The Office of Health Services will work with the EDC to audit compliance with training requirements. Attendance records will be maintained and available for examination.

Timeline for Completion: 07/01/08

### *Screening and Treatment*

### 10. Medical Screening

The DOC will use the updated DACS intake module for the medical and mental health screening as required under this provision. A printed copy of the medical/mental health screening will be placed in the permanent medical chart.

The medical screening addresses the following issues:

- identification of individuals with serious medical and mental health issues;
- identification of acute medical needs;
- infectious diseases;
- chronic conditions;
- physical disabilities;

10

- mental illness;
- suicide risk; and
- identification of potential for drug and alcohol withdrawal.

This module includes a full mental health screening. Notification of a mental health provider for issues requiring immediate attention and follow-up will occur via this module system. The DOC is currently using a version of this system that is, as noted above, scheduled for full implementation by 10/30/07. Emergent referrals are currently made via telephone.

      The Director of Health Services, the medical vendor, and the Quality Improvement Administrator share responsibility for compliance with this provision.

Timeline for Completion: 10/30/07

## 11. Privacy

The Commissioner of Correction is leading the effort to achieve full compliance with this provision.

- The DOC is reviewing long-term expansion plans at the Facilities in an effort to assure that privacy is accommodated in all areas where a medical or mental health service will be provided.
- The DOC will study the feasibility of consolidating a range of medical and mental health services into a centralized facility.
- A capital improvements plan is being prepared for presentation to the legislature.
- Because capital improvements require long range planning and substantial funding, staff are evaluating all of the Facilities to identify strategies for:
  - o making the best possible use of existing space and;
  - o addressing privacy issues.
- Examples of improvements already made include:
  - o At HRYCI, an additional patient examination room has been created from space previously used to store records.
  - o At BWCI, two offices outside the medical area, previously used for other purposes, have been provided for mental health services, freeing up an additional office in the medical area for an exam room.
  - o At SCI, a large storage closet outside the medical area was appropriately modified and converted into an interview room for the psychiatrist.
- Site Wardens and the Director of Health Services are jointly responsible for the Facility evaluations.

Timeline for Completion:

Facility evaluations: 07/01/07
Implementation of short-term changes to available space: 12/30/07

11

Capital improvements plan to be presented to the bond bill committee in June 2007.
Full compliance: Continuing

## 12.    Health Assessments

The Director of Health Services, the medical vendor, and the Quality Improvement
Administrator will be responsible for facilitating compliance with the requirements of
this provision.

### 12a.    Timely Medical and Mental health Assessments

- The DOC will use the updated DACS module to track intakes and referrals to
  chronic care and mental health.
- As noted above, the DOC is currently using a telephone system for emergent
  referrals to mental health. This system will be used until full implementation
  of the updated DACS module.
- Referrals will be made directly from the intake system to either the sick call
  scheduling process, or to the mental health supervisor on call.
- This system allows for quick turnaround of any chronic disease or mental
  health issue identified during the intake process.
- The referral will be made within 24 hours, and appointments with providers
  will be scheduled within the time frame prescribed in the MOA.
- All inmates will receive a full health assessment, regardless of identified
  illness, within 14 days, while inmates identified at intake with a chronic
  illness will receive a full health assessment within 7 days.
- In accordance with NCCHC standards, any inmate who was previously
  incarcerated and received an intake physical exam within the previous 12
  months will receive an intake screening and chart review. If that screening
  and chart review indicate no change in health status from the previous intake,
  a new full physical exam will not be required.
- The Office of Health Services will audit intake procedures quarterly to
  monitor compliance with these standards.

Timeline for Completion:

Final roll out of updated DACS module: 10/30/07
Quarterly auditing: Continuing

### 12b.    Tracking of Inmates with Chronic Illness

- DOC will use the DACS system and manual lists to track those inmates who
  are identified (at intake or subsequently) as having a chronic condition.
- Procedures for running chronic care clinics are being amended so that
  scheduling decisions will be based on the degree of control of the illness.
  - Inmates whose illnesses are under poor control will have more
    frequent visits to the provider for appropriate evaluation and treatment.

12

- o At a minimum, the DOC plans to assure that all chronic care patients are evaluated by a provider at least once per quarter.
- Quality improvement evaluations will be conducted by the Office of Health Services, using a DOC audit tool, every two months for the first two quarters after full implementation occurs, and every three months for the following quarters.

Timeline for Completion:

Full implementation of new chronic care scheduling procedures: 10/30/07
A paper tracking and scheduling system currently exists.
Quality improvement and audit evaluations have already begun. Auditing of the new system is expected to begin by 12/30/07.

## 13.    Referrals for Specialty Care

The medical vendor and the Quality Improvement Administrator will share responsibility for assuring compliance with this provision.

### 13a.    Referral of Inmates Whose Needs Exceed Facility Capabilities

- The DOC has established a consult tracking system.
- The efficacy of the tracking system will be audited on a quarterly basis to evaluate whether:
    - inmates are referred in a timely manner;
    - consultants' recommendations are reviewed by appropriate referring staff; and
    - clinician responses to consultants' recommendations are documented.

Timeline for Completion:
Consult tracking system identification: Completed
Initial quality improvement audits: 10/30/07

### 13b.    Tracking and Documenting Specialist Findings and Recommendations

After each consultant visit, immediately on return to the institution, a nurse will:
- review the documentation provided by the consultant;
- schedule a follow-up appointment with the referring (DOC vendor) provider to review the consultant's findings and see the patient.

The follow up visit with the provider is to occur no later than 7 days after the consultant appointment.

Recommendations made by the specialist and discussion with the patient will be noted in the progress notes of the patient chart.

13

The DOC audit tool is used on a quarterly basis to assure that appropriate follow up occurs and is properly documented.

Timeline for Completion:

The DOC's goal is to achieve full compliance with this provision by 10/30/07. Auditing has already begun, and is conducted every two months for the first two audits and quarterly thereafter. Review of the audit results is immediate, and corrective action is taken with the medical vendor to reinforce DOC policy.

## 14.    Treatment or Accommodation Plans

The Facility wardens and the medical vendor will share responsibility for assuring compliance with this provision.

### 14a.    Special Needs Plans

Special needs treatment plans will be developed by the medical and/or mental health providers for all special needs inmates, as defined in NCCHC standards. These plans will include, at a minimum, frequency of follow-up, the type and frequency of diagnostic testing and therapeutic regimens, and when appropriate instructions about diet, exercise, adaptation to the correctional environment, and medication.

Timeline for Completion: 10/30/07

### 14b.    Discharge Planning

For inmates with special needs, who have been in our facilities longer than 30 days, appropriate discharge planning will be included in the treatment plan. Such discharge planning shall be made in relation to the anticipated date of release.

Timeline for Completion: 10/30/07

## 15.    Drug and Alcohol Withdrawal

The Substance Abuse Treatment Program Administrator, Director of Health Services and medical vendor will share responsibility for assuring compliance with this provision.

### 15a.    Policies, Protocols, and Practices to Identify, Monitor, and Treat Withdrawal

The DOC will develop or revise appropriate policies, protocols, and practices for the identification, monitoring and treatment of inmates at risk for, or who are experiencing,

14

drug or alcohol withdrawal. The intake screening process will be the first line of defense for identifying at-risk individuals and implementing these policies and procedures. The DOC plans to work with the medical vendor and security staff to assure that appropriate personnel are trained on any new policies.

Timeline for Completion:

Drafting and revision of policies: 07/01/07
Staff training: 12/30/07

### 15b.   Withdrawal and Detoxification Programs

The DOC will follow the policies developed for appropriate withdrawal and detoxification of inmates who are at risk of or who have symptoms of drug or alcohol withdrawal.

Timeline for Completion:

Policies: 07/01/07

### 15c.   Methadone Maintenance for Pregnant Inmates

The DOC will work with a community provider to establish an appropriate methadone maintenance program for those inmates who are identified as pregnant at intake and are in a community methadone maintenance program or addicted to opiates.

The DOC will evaluate local and national standards for women who are pregnant and on a methadone maintenance program to assure that the DOC program meets generally accepted professional standards.

Timeline for Completion:

Development of policies: 07/01/07
Full implementation: 12/30/07

### 16.   Pregnant Inmates

The medical vendor, Quality Improvement Administrator, and the Director of Health Services will work together to achieve compliance with this provision.

- The DOC will develop or revise and implement policies and procedures consistent with the appropriate screening, treatment and follow-up of pregnant inmates.

15

- Policies will be developed to specifically address those patients identified as "high risk" pregnancies.

- All women are currently screened for pregnancy at intake, and the DOC plans to continue this practice.

- The Director of Health Services and the medical vendor are jointly responsible for auditing and assuring compliance with this item.

Timeline for Completion:

Development of policies: 07/01/07
Training on policies: 10/30/07
Full implementation: 12/30/07

## 17. Communicable and Infectious Disease Management

The DOC Quality Improvement Administrator, Director of Health Services, and the medical vendor will share responsibility for assuring compliance with this provision.

- Polices will be developed and/or revised relating to the identification of individuals in DOC custody with communicable diseases.
- Appropriate screening and treatment for inmates with communicable diseases will be instituted.
- Communicable and infectious disease statistics will be collected, analyzed, and available for review by the Monitor.
- Monthly reports will be instituted to assist with consistency of treatment and control of identified diseases.

Timeline for Completion:

Policy development: 07/01/07
Full implementation: 10/30/07

## 18. Clinic Space and Equipment

The Commissioner of Correction, bureau chiefs, and wardens will work with appropriate State authorities to achieve compliance with this provision.

- The DOC is reviewing expansion plans at the Facilities to assure that in all areas where a medical or mental health service is provided that adequate space for private, face-to-face nursing and physical examinations is available.
- The DOC will study the feasibility of consolidating a range of medical and mental health services into a centralized facility.

16

- Because capital improvements are long term solutions, sites are reviewing initial strategies for addressing space and privacy needs.
- Examples of improvements already made include:
    - At HRYCI, an additional patient examination room has been created from space previously used to store records.
    - At BWCI, two offices outside the medical area, previously used for other purposes, have been provided for mental health services, freeing up an additional office in the medical area for an exam room.
    - At SCI, a large storage closet outside the medical area was appropriately modified and converted into an interview room for the psychiatrist.

Timeline for Completion:

Site evaluations: 07/01/07
Initial solutions to be implemented: 12/30/07
Capital improvements plan to be presented to the bond bill committee: 06/07

### 18a.    Privacy for Clinical Exams

Evaluations of each site are taking place to make any initial modifications to the layout of each clinic area. Each site will conduct an audit to identify the specific areas where such changes are possible.

Timeline for Completion:

Evaluations: 07/01/07
Initial modifications/changes: 12/30/07

### 18b.    Adequately Sized and Equipped Exam Rooms

Evaluations of each site are taking place to make any initial changes to the layout of each clinic area. Each site will conduct an audit to identify the specific areas where such changes are possible.

Timeline for Completion:

Evaluations due 07/01/07
Minor modifications/changes due 12/30/07

### 18c.    Action Plan (Paragraph 65) Regarding Bringing Facilities Into Compliance

The DOC expects to present a capital improvements plan to the bond bill committee in June 2007.

17

## *Access to Care*

### 19.    Access to Medical and Mental Health Services

The Commissioner of Correction, Facility wardens, medical vendor, and Director of Health Services share responsibility for assuring compliance with these provisions.

#### 19a.    Opportunity to Request and Receive Medical and Mental Health Care

The DOC will develop or revise and implement policies assuring that inmates have both the opportunity to request and receive medical and mental health care.

Timeline for Completion:

Policies: 07/01/07
Implementation: 10/30/07

#### 19b.    Medical Response to Requests

- Currently, and according to the policy in development, all written requests for medical/mental health care will be screened within 24 hours.
- If a clinical symptom is reported, a face-to-face encounter will occur within 72 hours from the time of request, at the latest; or earlier if the screening process identifies that the patient needs to be seen more promptly.

Timeline for Completion:

Policies: 07/01/07
Implementation: 10/30/07

#### 19c.    Adequate Security Staffing to Ensure Timely Escort

- The DOC will ensure that adequate security staff are available and accessible to inmates who need to be escorted to the medical/mental health appointment as necessary.
- Facility Wardens and local medical vendor staff will be responsible for assuring compliance with this requirement. Scheduling delays, canceled sick call visits, and/or missed appointments will be evaluated through the DOC audit mechanism to identify the root cause of the delay in providing services. Security-related reasons for the delay will be noted, and evaluated for appropriate corrective action.

Timeline for Completion:

Policies: 07/01/07

Implementation: 10/30/07

### 19d.    Develop and Implement Sick Call Policy

The DOC will develop or revise and implement a sick call policy that will address the following areas:

- an explanation of the order in which patients are scheduled;
- a specific procedure for scheduling patients;
- locations for treatment;
- requirements for clinical evaluations; and
- the maintenance of a sick call log.

Timeline for Completion:

Policies: 07/01/07
Implementation: 10/30/07

### 19e.    Treatment in Response to Sick Call Request in a Clinical Setting

- A policy will be developed and/or revised providing that all sick call visits will take place in an appropriate, private setting conducive to the activity.
- In some areas this will be difficult without the physical plant changes noted in ¶¶ 11 and 18.
- The DOC will work to assure that, in the meantime and to the extent possible, the clinical setting is appropriate for the service to be provided.

Timeline for Completion:

Policies: 07/01/07

### 20.    Isolation Rounds

The DOC will be responsible for drafting appropriate policies, and the medical vendor is responsible for actually performing in compliance with this provision.

- The DOC will develop or revise and implement a policy to assure that medical staff make daily sick call rounds in isolation areas and nursing staff make rounds at least three times a week.
- The policy will indicate that the intent is to provide an opportunity for inmates in isolation adequate opportunity to contact and discuss health/mental health concerns with appropriate medical/mental health staff in a setting that affords as much privacy as the security concerns allow.

Timeline for Completion:

Policies: 07/01/07

19

Implementation date: 10/30/07

## 21.   Grievances

The Office of Health Services, Quality Improvement Administrator, and medical vendor will share responsibility for assuring compliance with this provision.

### 21a.   Develop and Implement Medical Grievance System

- The DOC will develop or revise and implement an improved grievance system.
- That system will ensure that medical grievances are processed and addressed in a timely manner. The Office of Health Services, along with the Bureau of Prisons, is the responsible party for assuring that grievances are handled in an efficient and effective fashion. The contract audit nurses are part of the team that will work to evaluate the effectiveness of the system, and make suggestions for improvement.

Timeline for Completion: 12/30/07

### 21b.   Medical Grievances and Responses Placed in Inmate Files

- Medical issues raised by the grievance process will be addressed and actions taken will be noted in the progress notes of the inmates' medical record.
- The actual grievance is maintained electronically, under each inmate's name, in DACS as described in ¶ 21c below.

Timeline for Completion: 12/30/07

### 21c.   Log, Review, and Analyze Grievance Outcomes

- Grievances, along with all updates, appeals, responses, and outcomes are, and will continue to be, logged in the DACS system, which can be reviewed by all parties.
- The Office of Health Services will review and analyze the grievances on a monthly basis to identify and note any systemic issues raised by the grievances.

Timeline for Completion: 12/30/07

### 21d.   Develop and Implement Procedure for Addressing Systemic Problems

- The DOC will develop and implement a comprehensive system for understanding and addressing all systemic problems discovered through the analysis conducted in ¶ 21c, above.
- On a monthly basis, the Office of Health Services will be responsible for reviewing systemic problems and making recommendations for systemic responses.

Timeline for Completion:  12/30/07

### *Chronic Disease Care*

**22.     Chronic Disease Management Program**

The Health Services Director, the Quality Improvement Administrator, the audit nurses, and the medical vendor staff will share responsibility for assuring compliance with this provision.

**22a.     Develop and Implement Chronic Care Disease Management Program**

- The DOC will develop or revise and implement a Chronic Care Disease Management Program to identify and track inmates with chronic conditions.
- The DOC plans to implement a Chronic Care Disease Management Program that is driven by the level of control achieved for any given chronic condition.
  - For example, the frequency of chronic care appointments will be based on degree of control of the illness.
  - Each chronic care patient will be seen at least quarterly.
  - Those under poor control will have more frequent visits to the provider for appropriate evaluation and treatment.
- Appropriate diagnosis, treatment, monitoring and continuity of care are important components of the Chronic Care Disease Management Program and will be tracked accordingly.
- Quality improvement audits will be conducted using the DOC audit tool every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion: 12/30/07

**22b.     Maintain Registry of Inmates with Chronic Disease**

- DOC will use the DACS system and a manual registry to track those inmates who at intake, or on subsequent occasions, are identified as having a chronic condition.
- Compliance with this requirement will be audited every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion:  12/30/07

**23.     Immunizations**

The DOC Office of Health Services, and the medical vendor will share responsibility for assuring compliance with this provision.

### 23a.    Obtain Immunization Records for Juveniles

- The DOC plans to work with the Division of Public Health Immunization program to obtain records, if available, of those juveniles who are in the custody of the DOC.
- Records obtained will become a part of the unified patient chart.

Timeline for Completion:

Policies: 07/01/07

### 23b.    Update Juvenile Immunizations

- The DOC plans to develop or revise immunization policy consistent with current immunization standards.
- The DOC plans to implement standards that are consistent with current nationally recognized guidelines, adolescent immunization standards, and Delaware School Admission requirements.

Timeline for Completion:  10/30/07

### 23c.    Develop Policies and Procedures for Influenza, Pneumonia, and Hepatitis A and B Vaccines

- The DOC plans to develop or revise and implement immunization policies, which will include policies for identifying inmates who require immunizations.
- DOC policies will address immunizations that may be indicated in connection with certain chronic diseases or other conditions, as well as immunization schedules that are appropriate for certain categories of inmates.
- Patients will be evaluated for the following immunizations:  pneumonia, influenza, Hepatitis A and B.
- Inmates will be offered immunization based on the criteria established by the policy.
- Medical staff and physician extenders will be trained on immunization protocols
- The medical vendor's Quality Assurance/Control of Infectious Disease ("QA/CID") nurse will be required to monitor compliance with these policies

Timeline for Completion:

Policies: 07/01/07
Implementation start date for immunizations:  10/01/07

*Medication*

### 24.    Medication Administration

The medical vendor, DOC security staff, and Quality Improvement Administrator will share responsibility for assuring compliance with this requirement.

#### 24a.    Appropriately Prescribe and Administer Medications in Timely Manner

- The DOC plans to develop or revise and implement policies that are consistent with NCCHC standards for the prescription and delivery of appropriate medications, based on an assessment and clinically indicated by symptomotology.
- The current formulary will be assessed for appropriateness.
- The DOC intends to draft policies that will require prescribing practitioners to note in the medical record if an alternative medication is indicated and the reason for prescribing the alternative medication. The alternative medication will be made available within 72 hours.

Timeline for Completion:

Policies:  07/01/07
Training:  08/01/07
Implementation date:  10/30/07

#### 24b.    Appropriate Access to Medications

- The DOC will develop or revise and implement policies to assure that inmates who are prescribed medications receive those medications on a schedule consistent with clinical practice guidelines and the instructions of the prescribing practitioner.
- A formulary committee was established in February 2007, and is scheduled to meet on at least a quarterly basis.
- The formulary committee will include the Medical Director, Director of Nursing, Director of Psychiatry, one staff clinician, one advanced practice nurse, the DOC Director of Health Services, the DOC Mental Health Treatment Services Administrator and one other DOC professional employee.
- Minutes of the formulary committee meetings will be available for review and examination.

Timeline for Completion:

Policies:  07/01/07
Implementation date:  08/01/07

### 24c.    Policies and Procedures Regarding Missed Doses

- DOC will develop or revise and implement policies to ensure that the prescribing practitioner is notified if a patient misses doses of a particular medication on three consecutive days.
- Notice to the provider shall be documented, according to policy, in the medical chart.
- Compliance with this requirement will be audited every two months for the first two quarters beginning July 2007 and every three months for the following quarters.

Timeline for Completion:

Policy development: 07/01/07
Implementation date: 08/01/07

### 24d.    Formulary Shall Not Unduly Restrict Medications

- The DOC will develop or revise formulary policies which reflect the understanding that the formulary developed will not unduly restrict medications.
- Additions and deletions from the formulary will be made by vote of the committee and reasons for the addition or deletion of any particular medication will be noted in the minutes of the committee.
- Non-formulary requests must be submitted to the vendor's medical director for approval.
- Reasons for denial must be documented and alternatives noted on request forms.

Timeline for Completion:

Policies: 07/01/07
Training: 08/01/07
Implementation date: 10/30/07

### 24e.    MARs Appropriately Completed and Maintained

- The DOC is currently using a MAR in the unified chart.
- The DOC will develop or revise policies to require that medications prescribed are noted in a MAR, which will be a part of each inmate's medical file.
- DOC policies will require documentation in the MAR that is consistent with standard practices.
- Compliance with DOC policy will be audited every two months for the first two quarters beginning July 2007 and every three subsequently.

Timeline for Completion:

24

Finalization of policy: 07/01/07

Total implementation and completion of first Quality Improvement Audit: 10/30/07

### 25.　Continuity of Medication

- The DOC will develop or revise policy to assure that on intake each entering inmate is screened for medications currently prescribed and those medications are noted on the intake form.
- That list will be forwarded to the prescribing practitioner, who will determine the medical appropriateness of any medications and note any changes to the medication regimen in the progress notes.
- A face-to-face encounter will be conducted when the medical condition so dictates.
- The medication prescribed will be ordered and administered consistent with the medication policy noted above.
- The DOC will implement changes to the DACS medical module to streamline this process.

Timeline for Completion

Policy: 07/01/07

Intake changes to the DACS system: 10/30/07

### 26.　Medication Management

- The DOC will develop or revise policies and procedures consistent with standard practice for the access to, storage of, and safe and proper disposal of medications and medical waste.
- The medical vendor and the Substance Abuse Treatment Services Administrator will be the responsible parties for compliance with this item.

Timeline for Completion:

Policy: 07/01/07

Training: 08/01/07

Implementation: 09/01/07

### *Emergency Care*

### 27.　Access to Emergency Care

The Director of Health Services, Mental Health Treatment Program Administrator, EDC and the medical vendor will share responsibility for assuring compliance with this provision.

### 27a.    Train to Recognize and Respond to Medical and Mental Health Emergencies

- As noted in ¶¶ 8 and 9 of this document, the DOC will assure appropriate training of staff who may respond to emergency situations.

Timeline for Completion:  01/01/08

### 27b.    Timely and Appropriate Care of Medical and Mental Health Emergencies

- The DOC will develop or revise policies requiring medical personnel to use appropriate clinical judgment to determine whether the inmate must be transported to an outside facility for emergency treatment.
- If medical staff are not available, the policy will require transportation of the patient to an appropriate facility for evaluation.

Timeline for Completion:

Policy:  07/01/07
Implementation:  01/01/08

### 28.    First Responder Assistance

#### 28a.    First Responder Training

As noted in ¶¶ 8 and 9 of this Action Plan, the DOC will continue to conduct training sessions for all employees. Training materials and schedules will be available to the monitor for inspection.

Timeline for Completion:  01/01/08

#### 28b.    Emergency Response Protective Gear

Consistent with the training noted above, protective gear will continue to be made available.  Protective gear includes items such as masks, gloves, etc.

Timeline for Completion:

Training:  10/30/07

26

Full implementation: 01/01/08

## *Mental Health Care*

### 29.    Treatment

Mental Health Treatment Program Administrator, the Clinical Director of Mental Health, and the medical vendor will share responsibility for assuring compliance with this provision.

- The DOC will develop policies to address the provision of mental health services by qualified mental health professionals.
- The policy will address timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities for inmates who are diagnosed with a mental health illness.
- The policy will also address the need for specific observation of and assessment of those inmates who are identified as suicidal, and those who enter DOC with a serious mental health condition or need, or who develop such a need after incarceration.

Timeline for Completion:

Policy: 07/01/07
Full implementation: 10/30/07

### 30.    Psychiatrist Staffing

The Office of Health Services will work with the medical vendor to identify qualified psychiatrists to meet the psychiatrist staffing needs in the DOC system.

#### 30a.    Psychiatrist Staffing

- Additional psychiatric staff are scheduled to be hired because of staffing increases negotiated in April 2007 with the current medical vendor.
- The DOC will assist the medical vendor in recruiting and retaining qualified psychiatrists to meet the mental health needs of inmates housed in the Facilities.
  - o  The DOC plans to work with the Medical Society of Delaware to identify qualified candidates.
  - o  The DOC also plans to contact regional medical schools to identify recruiting opportunities.
- The DOC will work with the Clinical Director of Mental Health and the medical vendor to identify the appropriate number of psychiatrist hours required to participate in individualized treatment plans, prescribe and adequately monitor

27

psychotropic medications, review charts, and respond to diagnostic and laboratory tests.
- As noted in ¶ 5, the DOC will ensure that psychiatrists hired by the medical vendor have appropriate licenses and certifications.
- The DOC will maintain a roster of all professionals providing this service, including the sites they are assigned to and the number of hours provided.

Timeline for Completion: Continuing

### 30b.    Psychiatrist Duties and Responsibilities

- The DOC will work with the Clinical Director of Mental Health to assure that all psychiatric staff:
    - o  collaborate with mental health staff to identify the resources needed to care for those with serious mental health illness; and
    - o  communicate those needs to the warden of the particular Facility, while maintaining autonomy regarding clinical decisions.
- Psychiatrists assigned to a Facility will oversee the Facility's mental health treatment team.

Timeline for Completion: 10/30/07

### 31.    Administration of Mental Health Medications

Responsibility for compliance with this provision will be shared by the medical vendor, Mental Health Treatment Program Administrator, nursing supervisors, and the Quality Improvement Administrator.

### 31a.    Policies, Procedures, and Practices Regarding Prescribing, Distributing, and Monitoring Psychotropic Medications

- As noted in ¶ 24 of this Action Plan, the DOC will develop or revise and implement medication prescribing, ordering, distribution and reordering policies consistent with professional standards.
- This procedure will apply to all medications, including those prescribed for psychiatric conditions.

Timeline for Completion:

Policy: 07/01/07
Implementation: 10/30/07

### 31b.    MAR Documentation

- As noted in ¶24 of this Action Plan, the MAR will be used to document the time and amount of medication given and any refusal by the inmate.

28

- Only registered and licensed practical nurses will be allowed to administer medications to inmates in the Facilities, in accordance with Delaware law.
- Compliance with existing policies requiring nurses to perform mouth checks will be monitored.
- Compliance with policies requiring nurses to note any adverse effects of medications in the patient record will be audited at each Facility with the DOC audit tool every two months for the first two quarters beginning 10/30/07, and every three months for the following quarters.

Timeline for Completion:

Policies: 07/01/07
Total implementation and completion of first Quality Improvement audit: 10/30/07

### 31c.   MAR Review

- MARs will be reviewed on a regular basis by the nursing supervisor assigned to the particular clinical area.
- This review will be to assure that policies and procedures are being followed consistently and thoroughly.
- Notations in the progress notes of the medical chart will also be reviewed for appropriate documentation.

Timeline for Completion:

Policy: 07/01/07
Training: 08/01/07
Total implementation and completion of first review by nurse supervisor: 10/30/07

### 32.   Mental Illness Training

As noted in ¶¶ 8 and 9 of this Action Plan, mental illness training will be conducted consistent with this portion of the MOA.

- Security personnel who are assigned to the special needs units will have training designed for their job locations.
- Qualified mental health professionals will provide training through on-site or via interactive Internet.

Timeline for Completion: 01/01/08

### 33.   Mental Health Screening

### 33a.   Screening within 24 Hours

29

- As noted in ¶¶ 10 and 12 of this Action Plan, the DOC plans to use the updated DACS module for the initial intake process.
- This intake system is designed to be consistent with generally accepted mental health screens conducted according to NCCHC standards.
- The DOC expects that mental health screening performed with this tool will identify any history of mental illness, current psychiatric medications, potential for suicide ideation, past suicide attempts, or suicidal tendencies.

Timeline for Completion:

Policy development: 07/01/07
Screening tool on line: 10/30/07

### 33b.    Psychiatric Assessment

- The DOC will develop or revise policies to require a face-to-face encounter with a psychiatrist before any changes are made to psychotropic medications.
- The DOC expects that this assessment will take place no later than 10 days after the intake is completed.
- Inmates who require resumption of psychotropic medications are expected to be seen as soon as clinically appropriate, but no later than 10 days after intake.

Timeline for Completion:
Policy development: 07/01/07
Full implementation of policy due to lag time in hiring psychiatrists: 01/01/08

### 33c.    Medication Continuation

- The DOC will develop or revise policies intended to assure that generally accepted professional standards are met in identifying whether an inmate was prescribed psychotropic medications at the time of intake and that orders for the continuation of psychotropic medications are written in accordance with the provisions of the MOA.

Timeline for Completion:

Policy development: 07/01/07
Full implementation of policy: 10/30/07

### 33d.    Emergency Mental Health Referral

- The DOC will develop or revise its policies to require direct communication, either in-person or via telephone, with a qualified mental health professional when an immediate referral to a qualified mental health professional is clinically indicated, based on the inmate's responses to the intake screening.

- Quality Improvement systems developed for mental health referrals will be used to assure adherence to this policy.

Timeline for Completion:

Policy development: 07/01/07
Implementation of updated DACS module and Quality Improvement activities: 10/30/07

## 34.    Mental Health Assessment and Referral

The Clinical Director of Mental Health, the medical vendor, and DOC mental health personnel share responsibility for assuring compliance with this provision. DOC personnel will also assist with updates to the DACS mental health modules.

### 34a.    Mental Health Assessment

- When the updated DACS module is completed, it will automatically refer any inmate identified during the intake process as requiring an assessment by a qualified mental health professional.
- Inmates referred for routine mental health referrals are to be seen by a mental health professional within 72 hours.
- The vendor has been instructed that it must make direct contact with a qualified mental health professional when an urgent referral is needed for an urgent problem.

Timeline for Completion:

Policy development: 07/01/07
Full implementation: 10/30/07

### 34b.    Confidential Self-Referral

- The DOC will develop or revise policies to assure that each inmate will have access, regardless of institutional setting, to a confidential self-referral system without the need to reveal the substance of the request to security staff.
- The DOC will work to assure that written requests will be evaluated daily and triaged by qualified mental health professionals for immediate and routine evaluation.
- DOC policies will require the medical vendor to arrange for a face-to-face encounter with a qualified mental health professional within 72 hours of the request.

Timeline for Completion:

31

Policy development: 07/01/07
Implementation: 10/30/07

### 34c.    Referral for Specialty Care

- The DOC will develop or revise policies regarding referrals to specialty psychiatric care, if such a need is identified based on the face-to-face clinical evaluation of a psychiatrist.
- All patients identified with a serious mental health condition will have routine mental health visits scheduled.
- The referral process will be monitored via regular compliance audits.

Timeline for Completion:

Policy development: 07/01/07
Full implementation of policy due to unavoidable lag time in hiring psychiatrists: 01/01/08

### 35.    Mental Health Treatment Plans

- The DOC will develop or revise policies to assure that patients requiring ongoing mental health services have a treatment plan based on diagnosis and individual clinical needs.
- DOC policies will require treatment plans to be prepared at the time of the initial assessment and updated at a minimum of quarterly.
- DOC policies will also require that changes to a treatment plan be documented in the unified medical record.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 10/30/07

### 36.    Crisis Services

Responsibility for assuring compliance with this requirement will be shared by the Commissioner of Correction, Deputy Attorney General assigned to the DOC, Mental Health Treatment Program Administrator, and the medical vendor.

### 36a.    Adequate Array of Crisis Services

- The DOC will develop or revise policies assuring that appropriate services are available in the event of a psychiatric crisis.

32

- Transfer to the Delaware Psychiatric Center ("DPC") will be used when it is determined that in-patient psychiatric care is necessary to stabilize the patient.
- It is currently, and will continue to be, the policy of the DOC that administrative/disciplinary isolation or observation status is not a substitute for in-patient psychiatric care.

Timeline for Completion:

Policy development: 07/01/07
Full implementation of referral to DPC: 01/01/08. (Additional time is required for full implementation of referral policies because Department of Health and Social Services policies regarding the availability of beds may also have to be revised.)

### 36b.    In-Patient Psychiatric Care

- The Delaware Psychiatric Center will be used for in-patient psychiatric services.
- The DOC, Deputy Attorney General, and medical vendor will work together to assure that transfers to DPC occur as expeditiously as possible.
- The DOC also plans to develop strategies for assuring that adequate space is available for psychiatric care at each Facility.

Timeline for Completion:

Full implementation of referral to DPC: 01/01/08. (Additional time is required for full implementation of referral policies because Department of Health and Social Services policies regarding the availability of beds may also have to be revised.)

### 37.    Treatment for Seriously Mentally Ill Inmates

### 37a.    Space for Treatment

- The DOC will continue working to assure that space is available for the treatment of inmates with a mental health diagnosis.
- The DOC is currently reviewing potential expansion options at the Facilities.
- Because capital improvements are long range solutions to space issues, the Facilities will continue reviewing opportunities for short-term modifications to existing resources in an effort to improve space available for mental health treatment.

Timeline for Completion:

Site evaluations: 07/01/07
Minor changes: 12/30/07
Capital improvements plan to be presented to the bond bill committee in June 2007.

33

### 37b.  Staffing

Recruitment of qualified mental health professional staff has been initiated, and will continue on an as-needed basis

Timeline for Completion:

Continuing

### 37c.  Adequate Array of Therapeutic Programming

- Because the availability of therapeutic programming depends significantly on the mental health staffing levels, the DOC and medical vendor plan to continue recruiting efforts.
- The DOC will develop or revise policies on the appropriate use of therapeutic programming for those inmates identified as seriously mentally ill.

Timeline for Completion:

Policy development:  07/01/07
Implementation based on hiring appropriate qualified mental health professionals:
10/30/07

### 37d.  Regular Physician Visits for Inmates on Psychotropic Medications

- The DOC will develop or revise and implement policies to assure that patients who are being treated with psychotropic medications are seen routinely by a physician to monitor responses and potential reactions to the medications.
- The DOC will conduct audits to ensure compliance.
- The DOC will work with the medical vendor to ensure the relevant health care staff receive training on new policies.

Timeline for Completion:

Policy development:  07/01/07
Implementation of regular visits by physicians:  01/01/2008

### 38.  Review of Disciplinary Charges for Mental Illness Symptoms

Responsibility for compliance with this provision will be shared by Facility wardens, the Mental Health Treatment Program Administrator, Clinical Director of Mental Health, and medical vendor.

- The DOC will develop or revise and implement policies to assure that when any inmate identified as seriously mentally ill has a disciplinary charge resulting in

transfer to isolated status, the charge will be reviewed by a qualified mental health professional, who will evaluate the inmate, on the time schedule outlined in ¶ 39b below, to determine if there are mitigating factors related to the serious mental illness of the inmate.

- If the qualified mental health professional determines that such mitigating factors exist, this will be considered when punishment is imposed on that particular inmate with a serious mental illness.
- When serious security concerns exist that contraindicate the recommend remedy made by the mental health staff, a multidisciplinary case conference, including at a minimum security and mental health staff, will be held and an appropriate alternative will be identified.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of qualified mental health professional staff: 10/30/07.

### 39.    Procedures for Mentally Ill Inmates in Isolation or Observation Status

The Commissioner of Correction, Mental Health Treatment Program Administrator, and medical vendor will share responsibility for assuring compliance with this provision.

#### 39a.    Policies, Procedures, and Practices Regarding Treatment of Inmates Housed in Isolation

- The DOC will develop or revise and implement policies, procedures, and practices to ensure appropriate treatment of inmates housed in isolation, including isolation rounds one time per week by qualified mental health professionals.
- The DOC will conduct audits to ensure compliance.

Timeline for Completion:

Policy development: 07/01/07
Full implementation (depending on ability to hire qualified mental health professional staff): 10/30/07.

#### 39b.    Evaluation of Mentally Ill Inmates Placed in Isolation

- The DOC will develop or revise and implement policies to ensure initial evaluation by a qualified mental health professional within 24 hours for inmates with serious mental illness who are placed in isolation.
- After the initial evaluation, these inmates will be reevaluated for any psychological decompensation by a qualified mental health professional a minimum of three times per week.

35

- The DOC will evaluate whether continued isolation is appropriate, based upon the evaluation of a qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of a sufficient number of qualified mental health professional staff: 10/30/07

### 39c.    Documentation and Treatment Review by Psychiatrist

- The DOC will develop or revise and implement its policies, procedures, and practices to ensure adequate documentation by medical/mental health staff for all admissions to and discharges from isolation.
- Such documentation shall include a review of treatment by a psychiatrist.
- The DOC will work with the medical vendor to ensure the relevant health care staff receive training on new policies.
- The DOC will conduct audits to ensure compliance.

Timeline for Completion:

Policy development: 07/01/07
Implementation based on the hiring of qualified mental health professional and psychiatric staff: 10/30/07

### 39d.    Adequate Observation Facilities

- The DOC will provide adequate facilities for observation, with no more than two inmates per room.
- Evaluations of each site are taking place to identify potential options for complying with this requirement utilizing existing resources.
- Full compliance with this requirement will be accomplished as outlined in ¶ 18 above.

Timeline for Completion:

Evaluations: 07/01/07
Initial modifications/changes due: 12/30/07
Capitol improvements as outlined in ¶ 18 above

### 40.    Mental Health Services Logs and Documentation

Responsibility for assuring continuing compliance with this provision will be shared by the DOC Quality Improvement Administrator and the medical vendor.

### 40a.    Mental Health Log

- The DOC will continue maintaining a log of inmates receiving mental health services, listing all inmates receiving mental health treatment regardless of medication status.
- The log will continue to include the following information:
    o name;
    o diagnosis or complaint;
    o next scheduled appointment;
    o and medications and dosages.
- The log will continue to be maintained and made available to each clinician.

Timeline for Completion:

Log is currently available and will be maintained on a continuing basis. Log is available on request for inspection.

### 40b.    Updated and Accurate Medical Records

- Inmate medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.
- The DOC will continue to conduct quality assurance reviews of medical records to identify deficiencies and training needs.

Timeline for Completion:

Medical records are currently available; quality assurance monitoring will be continuing.

### IV.    Suicide Prevention

### 41.    Suicide Prevention Policy

The Mental Health Treatment Program Administrator and the Quality Improvement Administrator will be responsible for assuring compliance with this provision.

- The DOC will develop or revise a suicide prevention policy to ensure training, intake screening/assessment, communication, housing, observation, intervention, and morbidity and mortality review.

Timeline for Completion:

Policy development: 07/01/07

### 42.    Suicide Prevention Training Curriculum

37

The Mental Health Treatment Program Administrator and EDC share responsibility for developing the suicide prevention training curriculum.

- The DOC will develop or revise a suicide prevention training curriculum, which will include the following information:
  o the DOC suicide prevention policy;
  o the ways in which facility environments contribute to suicidal behavior;
  o potential predisposing factors to suicide;
  o high risk suicide periods;
  o warning signs and symptoms;
  o case studies of recent suicides and serious suicide attempts;
  o mock demonstrations regarding the proper response to a suicide attempt;
  o and the proper use of emergency equipment.

Timeline for Completion:

Training curriculum development: 06/15/07

### 43.    Staff Training

Mental Health Treatment Program Administrator, the Director of Health Services, the medical vendor, and EDC will share responsibility for compliance with requirements in this provision.

#### 43a.    Initial Training

- Consistent with ¶ 8b above, the DOC will ensure that training on suicide prevention for all existing and newly hired correctional, medical, and mental health staff will be provided using a monitor-approved curriculum as described in ¶ 42.

Timeline for Completion:

Curriculum available for DOJ review by 06/15/07
Training will commence upon DOJ approval of the curriculum, and is expected to be completed by 01/01/08.

#### 43b.    Refresher Training

- After initial training is completed, the DOC will ensure that all correctional, medical, and mental health staff receive an annual two-hour refresher training on the suicide prevention curriculum, described in ¶ 42 above, each year.

Timeline for Completion:

Policy development by 07/01/07

Refresher training is scheduled to begin one year after initial training is completed (this date will be driven by the date on which DOC receives approval of the curriculum from DOJ and begins the initial training).

### 44. Intake Screening/Assessment

Responsibility for assuring compliance with this section is being shared by Mental Health Treatment Program Administrator, the DOC Quality Improvement Administrator, DOC Management Information Systems, and CMS

- The DOC will develop or revise and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide.
- The screening will include inquiry regarding past suicide ideation and/or attempts, current ideation, threat, plan, prior mental health treatment/hospitalization, recent significant loss (job, relationship, death of a family member/close friend, etc.), history of suicidal behavior by a family member/close friend, suicide risk during prior confinement in a state facility, and the arresting or transporting officer(s) belief that the inmate is currently at risk.
- The updated DACS system will be used to track and identify if the inmate has any of the above factors noted on intake.
- Under the current intake system, these factors are noted and referrals are made via telephone to the qualified mental health professional.

Timeline for Completion:

Policy development: 07/01/07
DACS changes: 10/30/07

### 45. Mental Health Records

Health Services Director and the medical vendor are responsible for assuring compliance with this provision.

- The DOC will develop or revise and implement policies that require medical staff to immediately request all pertinent mental health records, regarding an inmate's prior hospitalization, court-ordered evaluations, medication and other treatment, upon admission.
- The DOC Office of Health Services will work with local providers to facilitate compliance.

Timeline for Completion:

Policy development: 07/01/07
Coordination with external agencies and education of intake medical staff: 10/30/07

39

**46.    Identification of Inmates at Risk of Suicide**

Policy development will be the responsibility of the DOC; the medical vendor will be responsible for implementing the policies as written.

- The DOC will develop or revise and implement policies that require medical staff place inmates identified as at risk for suicide on suicide precautions until they can be assessed by a qualified mental health professional.
    - o  Inmates identified as "at risk" include those who actively suicidal (i.e. threatening or engaging in suicidal behavior), those expressing suicidal ideation, (i.e. a vague wish to die without a plan), or those with a recent history of self-destructive behavior, and/or those who deny suicidal ideation and do not threaten suicide, but whose behavior indicates the potential for self-injury.
- The assessment is to occur according to the time limit stated below in ¶ 47.

Timeline for Completion:

Policy development : 07/01/07
Implementation based on the hiring of a sufficient number of qualified mental health professional staff:  10/30/07

**47.    Suicide Risk Assessment**

The Mental Health Treatment Program Administrator,  DOC Quality Improvement Administrator, and the medical vendor will share responsibility for compliance with this provision.

- The DOC will develop or revise and implement policies that require a formalized risk assessment to be conducted by a qualified mental health professional within the appropriate time frame, not to exceed 24 hours from the initiation of suicide precautions.
- The assessment shall include, but not be limited to, description of antecedent events and precipitating factors, suicidal indicators, mental status examination, previous psychiatric and suicide risk history, level of lethality, current medication, diagnosis, and recommendations/treatment plan.
- The assessment will be documented in the treatment record.

Timeline for Completion:

Policy development:  07/01/07
Training of existing staff by 08/01/07
Timing of full implementation will be governed partly by the medical vendor's ability to hire a sufficient number of qualified mental health professional staff, but the DOC's goal is to have this task accomplished by 10/30/07.

40

48.    **Communication**

The Mental Health Treatment Program Administrator and medical vendor share
responsibility for this provision.

### 48a.    Documentation for Inmates on Suicide Precautions

- The DOC will develop or revise and implement policies that require mental
  health or medical staff placing an inmate on suicide precautions to document the
  initiation of the precautions, level of observation, housing location, and
  conditions of the precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48b.    Notification of Mental Health Staff

- The DOC will develop or revise and implement policies requiring mental health
  staff to be provided with all of the documentation described in ¶ 48a (above).
- These policies will also require that in-person contact be made with mental health
  staff to alert them of placement of an inmate on suicide precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48c.    Medical Record Review

- The DOC will develop or revise and implement policies that require that mental
  health staff thoroughly review the health care record for documentation of any
  prior suicidal behavior.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48d.    Medical Record Documentation

- The DOC will develop or revise and implement policies requiring that mental
  health staff document each interaction with and/or assessment of a suicidal
  inmate in the health care record, including full justification of any decision to
  upgrade, downgrade, discharge, or maintain an inmate on suicide precautions.

41

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48e.   Downgrade / Discharge Suicide Precautions

- The DOC will develop or revise and implement policies stating that no inmate is downgraded or discharged from suicide precautions until the responsible mental and health care staff has thoroughly reviewed the inmate's health care record and conferred with correctional personnel regarding the inmate's stability.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 48f.   Multidisciplinary Case Management

- The DOC will develop or revise and implement policies requiring multidisciplinary case management team meetings (to include correctional, medical, and mental health staff) to occur on a weekly basis in order to discuss the status of inmates on suicide precautions.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 49.   Housing

The Mental Health Treatment Program Administrator, DOC Maintenance Department, DOC Wardens, and medical vendor will all share responsibility for assuring compliance with this provision.

### 49a.   Suicide Resistant Cells

The DOC will ensure that all inmates on suicide precautions are housed in suicide resistant cells (i.e. cells without protrusions that would provide easy access for hanging attempts), which provide full visibility to staff.

Cells used for suicide precautions are being or have been evaluated for suicide resistance at each of the facilities. At HRYCI, identified cells have been retrofitted with breakaway sprinkler heads. Suicide resistant air vents have been installed, and openings in window frames, which could have been used for hanging, have been sealed.

Timeline for Completion:

Facility improvements are either under way or being evaluated
Full compliance is expected to occur by 01/01/08

### 49b.    Mental Health Staff to Stipulate Conditions

- The DOC will develop or revise and implement policies requiring that the appropriate medical or mental health staff write orders in the health care record setting forth the conditions for the observation.
- Such orders will take into consideration all relevant security concerns.
- The Warden and or his or her designee will work with the mental health provider to resolve any dispute between custody and mental health/medical staff over which privileges are appropriate in a particular instance.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

## 50.    Observation

The Mental Health Treatment Program Administrator is responsible for drafting the policies required under this section, and, along with the medical vendor, will oversee training on the policies. The medical vendor and DOC security staff will share responsibility for implementing the policies.

### 50a.    Policies and Procedures Pertaining to Suicidal Inmates

- The DOC will develop or revise and implement policies and procedures relating to the observation of inmates who are suicidal or at risk for suicide under the criteria identified in ¶ 50 of the MOA.
- These policies will provide that such inmates are to be placed on close observation status and observed by staff at staggered intervals, not to exceed every 15 minutes.
- The DOC policy will provide that any inmate who is actively suicidal, i.e. threatening or engaging in suicidal behavior, will be placed on constant observation and observed by staff on a continuous, uninterrupted basis.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

### 50b.    Daily Mental Health Assessment of Suicidal Inmates

- The DOC will develop or revise and implement policies and procedures requiring that mental health staff interact with inmates on suicide precautions on a daily basis, rather than just observing the inmates.

Timeline for Completion:

Policy development:  07/01/07
Full implementation depends on the vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is to accomplish full implementation by 10/30/07

### 51.    Step-Down Observation

The Mental Health Treatment Program Administrator is responsible for drafting the policies required under this section, and, along with the medical vendor, will oversee training on the policies. The medical vendor and DOC security staff will share responsibility for implementing the policies.

### 51a.    Step-Down Level of Observation

- The DOC will develop or revise and implement policies and procedures requiring that inmates released from suicide precautions are gradually released via a "step-down," from a more restrictive level of observation to less restrictive levels, for an appropriate period of time prior to their discharge from suicide precautions.

Timeline for Completion:

Develop policy by 07/01/07
Train existing staff by 10/30/07
Full implementation will be contingent on the medical vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is for this to be accomplished by 01/01/08.

### 51b.    Follow-Up Assessment

- The DOC will develop or revise and implement policies and procedures requiring that inmates discharged from suicide precautions receive follow up assessment in accordance with a treatment plan developed by a qualified mental health professional.

Timeline for Completion:

Develop policy by 07/01/07
Train existing staff by 10/30/07

Full implementation will be contingent on the medical vendor's ability to hire a sufficient number of qualified mental health professionals, but the DOC's goal is for this to be accomplished by 10/30/07.

## 52.    Intervention

The Mental Health Treatment Program Administrator, Director of Health Services, medical vendor, and EDC will share responsibility for compliance with requirements in this provision.

### 52a.    First Aid and CPR Training

- The DOC will develop or revise and implement policies and procedures ensuring that all staff who come into contact with inmates receive training in CPR and First Aid on a biennial basis.

Timeline for Completion:

Currently up to date; training will be continuing.

### 52b.    Annual Mock Drill

Mock drill/demonstration will be a part of the initial and annual suicide trainings as outlined in ¶¶ 42 and 43 above.

Timeline for Completion:  01/01/08

### 52c.    Response Equipment

The DOC will ensure that emergency response equipment is available within close proximity to each housing unit, including a first aid kit and an emergency rescue (cut down knife) tool, and that all staff who come into contact with inmates know the location and proper use of the equipment.

Timeline for Completion:

Completed; compliance will be continuing.

## 53.    Mortality and Morbidity Review

The DOC Quality Improvement Administrator, Mental Health Treatment Program Administrator, and medical vendor share responsibility for assuring compliance with this provision.

Case 1:08-cv-00004-GMS    Document 1    Filed 01/03/2008    Page 81 of 82

- The DOC will develop or revise and implement policies and procedures ensuring that a multidisciplinary review is conducted to review all suicides and serious suicide attempts (e.g., those requiring hospitalization for medical treatment).
- The review will include an inquiry of:
  o the circumstances surrounding the incident;
  o facility procedures relevant to the incident;
  o relevant training received by staff involved;
  o pertinent medical and mental health reports involving the victim;
  o possible precipitating factors; and
  o recommendations, if any, that are made.
- A written plan will be developed to address any identified areas requiring corrective action.

Timeline for Completion:

Policy development: 07/01/07
Implementation: 08/01/07

## V. Quality Assurance

### 54.    Policies and Procedures

The DOC Quality Improvement Administrator, Director of Health Services, Mental Health Treatment Program Administrator, BOP Chief Richard Kearney, and the Deputy Attorney General assigned to the DOC share responsibility for assuring compliance with this provision.

- The DOC will develop or revise quality assurance polices and procedures that address each of the substantive provisions noted above.
- The DOC Quality Assurance Program will involve:
  o the creation of a multidisciplinary team;
  o morbidity and mortality reviews with root cause analysis;
  o periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.
- The DOC Quality Assurance program will be designed to assure that the DOC is able to regularly assess and address identified deficiencies.
- An assessment tool is currently being used for DOC Quality Improvement audits.
- This assessment tool permits data tracking and analysis of trends, and can be easily modified to address new issues.

Timeline for Completion:

Polices and procedure: 07/01/07
First Quality Assurance report: 10/30/07

46

## 55.    Corrective Action Plans

### 55a.    Policies and Procedures to Address Identified Problems

- The DOC will develop or revise policies and procedures as needed to address issues that arise during the Quality Assurance activities described in this Action Plan.

Timeline for Completion: 10/30/07 and continuing as needed

### 55b.    Corrective Action Plan

- When indicated by the results of a quality assurance review, the DOC will develop corrective action plans to address identified issues.
- The purpose of the corrective action plan will be to prevent future occurrences of identified issues.

Timeline for Completion:

As needed